## Case No. 7,800.

### KING et al. v. OHIO & M. RY. CO.

### ALSO THREE OTHER CASES.

[7 Biss. 529; 9 Chi. Leg. News. 401; 16 Alb. Law J. 165; 23 Int. Rev. Rec. 286; 25 Pittsb. Leg. J. 10; 2 Cin. Law Bul. 199.][1]

Circuit Court, D. Indiana. Aug. 1, 1877.

CONTEMPTS — INTERFERENCE WITH PROPERTY IN CUSTODY OF A RECEIVER—SUMMARY PUNISHMENT OF RIOTERS.

1. A receiver being an officer of the court, whose duty it is to protect the property and operate the roads under the direction and order of the court, the property thus placed in his possession is considered as property belonging to the court, and entitled to its protection.

2. In proceedings for a contempt, the court can proceed in a summary manner, and the accused is not, of right, entitled to a trial by jury.

3. Where the offense is clearly proved the court will proceed summarily to punish an offender.

4. Interference with the running of railroad trains is an offense public in its character.

[This was a suit by John King, Jr., and others against the Ohio & Mississippi Railway Company and several other defendants.] The Ohio & Mississippi Railway Company; the Indianapolis, Bloomington & Western Railway Company; the Indianapolis, Cincinati & Lafayette Railway Company; the Logansport, Crawfordsville & Southwestern Railway Company were, in the month of July, 1877, in proceedings of foreclosure of mortgages against them respectively, in the possession of receivers acting under the authority of the court, and required to operate the railways. During the strikes of the latter part of July, the trains of these various railways ceased for a time to run—a mob of strikers and others combining to stop them by force—of the Ohio & Mississippi Railway Company at Vincennes, of the Logansport, Crawfordsville & Southwestern Railway at Terre Haute, and of the two others at Indianapolis. The court, on information of the facts, issued orders to the marshal, in aid of the receivers, requiring him to prevent all disturbance of their possession, and to use his authority, as marshal, under the law, to enable them to operate the roads, and due notice was given at Vincennes. Terre Haute and Indianapolis, of the fact that these railways were in the custody of the court, and that there must be no interference with the possession. Several persons were, on complaint duly made, attached as for contempt of the authority of the court, and disobedience of its orders at Vincennes, Terre Haute, and at Indianapolis, and a hearing took place before the circuit and district judges. By agreement, the witnesses as to the facts, and the defendants, were heard orally in court. Some of the defendants admitted the offense, but the court

heard the facts, whether in aggravation or mitigation. The facts occurring at each place were substantially the same: A crowd or mob of strikers and others assembled at the depot, took possession, and during a part of the week of 22d–28th of July last, by force or intimidation arrested the running of trains. The employés of the receiver were by force or threats interrupted in the discharge of their duty. At Indianapolis, this was done by persons not connected with either of these roads there operated by receivers. There seemed to be some sort of order in their lawlessness. There was no direct damage done to property, but traffic was suspended for some days, the freight trains entirely, and the passenger trains more or less. They seemed willing to allow the postal cars to proceed, and they went on, with more or less interruption. The mob, headed by a committee, of which many of the defendants were members, assumed and held absolute control for a time over engines, cars and depots, and issued their orders whether passengers should be suffered to proceed (at times making an exception in favor of women and children), and whether there should be express matter, passengers or freight trains sent; in short they used the property as their own. Switchmen became general freight agents, firemen managers, and brakemen superintendents. After several efforts of the marshal at Indianapolis, the strikers surrendered the trains to the receivers, and they were run as usual. At Vincennes and at Terre Haute the trains were not regularly resumed till just before or at the time the United States troops appeared to enforce the authority of the court. It appeared by the testimony of witnesses, and the admissions of the defendants, that they all, except Reeves and Sayre, had been more or less active in taking the property from the control of the receivers. By the judiciary act of 1789 [1 Stat. 73], the courts of the United States had the power to punish by fine or imprisonment, at the discretion of the court, all contempts of their authority in certain cases. This was modified in 1831,[1] and the contempts for which persons are punishable, were restricted to the misbehavior of any person in their presence, or so near thereto as to obstruct the administration of justice, to the misbehavior of any of the officers of the courts in their official transactions, and to the disobedience or resistance by any such officer, or by any party, juror, witness, or other person, to any lawful writ, process, order, rule, decree, or command of the courts.

[The court held, as in the case of Secor v. Toledo, P. & W. R. Co. [Case No. 12,605], that the decree of the court appointing a receiver of a railroad, and authorizing and requiring him to take possession and to operate the same, was exclusive of all other

---

[1] [Reported by Josiah H. Bissell, Esq., and here reprinted by permission. 16 Alb. Law J. 165, contains only a partial report.]

[1] Rev. St. U. S. § 725.

persons; that it was a matter of public record, of which all persons were to take notice; and that it was a command to all unauthorized persons not to disturb the possession of the receiver; that the property was in the control of the court through its officer; that it was like property in the hands of the marshal under a writ of execution or replevin; in each case the authority of the court operating upon it; that it was the duty of the court to protect the receiver in executing its orders, in case he should be disturbed in the possession, and that the special orders and process issued in these cases were only in pursuance of the obligations imposed by law on the court; and that the forcible possession taken by the defendants, and their intimidation of the employees of the receivers, were a disobedience of the decree and orders of the court, and consequently a contempt of its authority.] [2]

Nelson Trusler, for the United States.

Benj. Harrison and C. A. Beecher, for receiver Ohio & M. Ry. Co.

J. W. Gordon and C. W. Fairbanks, for receiver Indianapolis, B. & W. Ry. Co.

A. W. Hendricks, for receiver Indianapolis, C. & L. Ry. Co.

Charles M. Osborne, for receiver Logansport, C. & S. W. Ry. Co.

A. G. Porter, William Herod, and Ferd. Winter, for defendants.

DRUMMOND, Circuit Judge. We have spent several days in examining the testimony concerning the interference by parties who have been brought before the court with the property in its custody. Four railroads, under the orders of the court, were placed in the possession of receivers. They became officers of the court, whose duty it was to protect the property and operate the roads under the direction and order of the court. The property thus placed in their possession is considered as property belonging to the court, and of course entitled to its protection by all the means which are at the disposal of the court; and the court, being a national court, has a right to call upon the nation, as such, to enforce its orders.

The court is the trustee of the property for the purpose, while foreclosure suits are pending affecting it, by which it is to be sold and turned over to those who are legally entitled to it. While it is thus temporarily in possession of the court, the court would fail of its duty which it owes to the ultimate owners of the property, and which it owes to the nation as such—if it were wanting in any respect in the use of those means which it had the right to employ for its protection.

I hardly think the testimony in the case of Mr. Sayre is sufficient to warrant the court in punishing him for contempt. It will be recollected that we proceed in a summary manner. The party is not, of right, entitled to a trial by jury. He is charged with an offense against the court. Wherever such an offense is committed, it may become the duty of the court to punish the party thus guilty, but the court never will in a doubtful case, in this summary way punish any person. It must always be a case free from doubt; where the overt act is clearly and distinctly proved. In this case it is quite clear that there was a certain understanding between Mr. Sayre and many—perhaps a large number of the strikers—that he sympathized with them in the object which they had in view; that he was willing to aid and co-operate with them to a certain extent; but whether or not he desired to go so far as directly to interfere with the operation of any of the railroads, and particularly with the railroads within the control of this court, does not clearly appear. He is therefore entitled to the benefit of the doubt which exists in the case. It is manifest, however, that while the proof is not so distinct upon the point as to justify the court in punishing him, that he was not doing his duty in the premises, considering his position as secretary of the society to which he belonged, many of whose members were undoubtedly engaged in this strike, and perhaps some of them in interference with the custody of the property of the court. What took place in the street when citizens were passing and he stopped them, and when he showed a peculiar favor to the strikers, is a most suspicious circumstance, and there are many other circumstances of a suspicious character developed in the evidence; but still he may have the right to say that his only connection with the strikers was to go so far as to cause the men to cease from work, and not to interfere directly with the running of trains, the latter of which and consequent disobedience of the orders of the court, is the only offense of which we can take cognizance.

It may be a question whether or not a court, under circumstances like those in which this court is placed, would have the right to punish a man as for a contempt who was interfering with those who were in the employ of a railroad, and trying to dissuade them from the performance of their duty, but that ground is so doubtful, even if it were established, that Sayre did thus interfere, and did thus persuade the men to abandon their duty by leaving their trains, that we do not choose to occupy it, so that on the whole, Sayre will be discharged; but there are so many suspicious facts the court will require him to enter into a recognizance for his good behavior, and to secure his non-interference with any property of the court for twelve months to come.

It may be that the other defendants had come grievances against their employers. That is a question into which we need not enter. In the present aspect of the case, I can only say this: That these receivers, being the

2 [From 9 Chi. Leg. News, 401.]

officers of the court, if any wrong were done by them to any of the employés of the road, the court is always open to hear those grievances, consider them and instruct the receiver to do complete justice to all the employés. So far in relation to the employés of the roads that are thus in the possession of the court: As to the employés of other railroads with which this court has no concern, of course, we cannot interfere. But, admitting that these defendants had grievances against the railroads, how are they to be redressed or removed? That is a very serious question. Are they to be removed by force, by violating the laws of the country, by interfering with so many of its business relations as must necessarily follow any obstruction of the operations of the roads? Is this the way in which grievances are to be redressed? Are we not all citizens of a common country? Do we not all desire to stand by the law? Is not the law ample to protect the rights of all?

These defendants, under the belief that wrongs had been done to them by the railroad officials, entered into a combination to right these wrongs, real or imaginary, by stopping the trains. That this was a great wrong will appear when we apply such a principle to any of the business relations of life. Suppose the employés of the various departments of business in this city should think that their employers did not pay them adequate wages, and should combine together, and require all persons thus employed to cease their employment, and so put a stop to all departments of business, to the stores, to the manufactories, to everything of that kind. Would that be right? Would it not be a great wrong for persons thus to do? Suppose in seed time the farm hands throughout a large section of this state should come to the conclusion that the farmers did not pay them wages enough, and should combine together and go around to the various farms and require the hands to strike, and prevent in this way the planting of seed? Suppose during harvest they should do the same thing—and prevent the farmers from harvesting their grain, corn or products of the soil? Would that be right? Would not it be a great wrong? And yet that would be the same thing in principle, as these railroad employés have done in this case, and throughout the country within the last two weeks.

It is not in this way that in the various relations of life any of the different classes of the community can have their wrongs righted.

If I understand the object of these strikes it was to compel the railroad officials, by force, namely, by suspending the operations of the trains, to pay them those prices that the strikers thought they were entitled to receive. If there is anything that is an axiom, a truth universally admitted to be correct, it is this: that we cannot by law fix the price of a bushel of wheat, or a barrel of flour, or of a piece of domestic, or of a horse, or of any such thing. These are to be regulated by the supply and demand, by the wants of the community. It is very much so with labor. We cannot say by law that the laborer shall have just such a price for his services. We cannot say by law that a fireman, or a switchman, or a conductor, shall have such a price, and so on. Throughout all the various classes of railroad employés those are matters to be regulated by the necessity for the labor. It is so with everything: and so every class of the community must receive compensation for services performed, whether it be railroad men, clerks, superintendents, lawyers, doctors, merchants, or whatever they may be. Whether performed or for how much must be settled by the parties themselves. In the case of labor, between the man who seeks the employment and a man who wants to employ him, it is a matter of agreement, and must always be. Therefore, it may as well be impressed upon these defendants, as upon all other persons, that it is not possible that they can say precisely how much they shall have for the service they perform; they have no right to dictate to their employers what they shall receive, nor has the employer any right to dictate to them what he shall give. It is a matter of common bargain and agreement, and unless it can be settled in this way we have to destroy all the relations of life.

You cannot go into the store of a merchant in this city and say, I will give you such a price for an article, and leave the money and remove it from the store. No; the owner of the article has a right to say what he will take for it, as well as the purchaser what he will give, and unless they agree the article must remain there.

When these railroad employés sought in this way to force those who employed them to pay a particular price, they were guilty of a wrongful act. Undoubtedly, they, as well as others, cannot be obliged to perform a service without their consent. If their employers do not give them as much as their services are worth, they have a right to leave and seek employment elsewhere. Let me impress upon the defendants this truth, that even many of those who may sympathize with you—and we all do in some respects—and encourage you even in what you have done, if you went to them and sought employment, they would not employ you if they thought they could have the service performed as well at a less rate. All men are alike about this; there is no difference, and cannot possibly be any difference among men on that subject. We all seek that which we desire at as cheap a rate as we can obtain it, and you yourselves, when you go to buy anything buy it as cheap as you can. This is the universal law of society, and it is an axiom in political economy. And yet there are reciprocal obligations between employer and employé. The one should desire to give adequate reward for

labor, skill or intelligence, the other only to receive what reward the business will allow to be paid.

This being so, the proper way, as it seems to the court, for any class who desire to have the service which they may perform, compensated at a better rate, is to spread the facts touching that service before the community and thus create a public sentiment in their favor, so that justice may ultimately be done to them by their employers. Rely upon it, this is the safest and best, and above all, this is the legal way in which to obtain a remedy for any wrong that is committed.

I can have no doubt from the evidence in this case that all these other defendants now before the court have participated in a common object, namely, to cause higher wages to be paid to them by stopping the trains from the running of which alone any wages could be paid; in other words, they thus desire to compel their employers to pay them higher wages.

Every man, as I have stated, has a right to leave the service of his employer if he is not satisfied with the wages he gets, but men ought not to combine together and cause at once a strike among all railroad employés, so as to prevent the running of trains, because the injury there is public in its character; it affects the whole country, as it were, and not a particular community or a particular neighborhood, and in several states it is made a public offense.

It may be that when this combination was made originally, the object was simply to suspend work on the road, but there was a most significant remark made by one of "the committee" at Terre Haute—Mr. Nesbit—to Mr. Claybrooke, the receiver of the Logansport Railroad, which I wish to use, and I wish I could re-echo it throughout the whole country, to every man who has any property or any interest which he desires to protect against wrong or violence; it is this: "There is an element in that crowd which I cannot control." There was an element there that was stronger than the committee; that is or may always be so. It is not possible always when you raise a mob or crowd, to violate the law, to tell where the operations of the mob will cease; and how far that violence will extend. They having thus raised the lawless spirit, it escapes beyond their control. No man can tell when his property may be safe. So true is it that there never should be any violation of law, and every citizen owes it to himself, to his country, and to any interest which he has in it, to stand by the law and never to violate it.

There was, as well at Vincennes and Indianapolis as at Terre Haute, a distinct understanding between these various persons who originated this strike, and who carried it on to accomplish an object in a particular way. Whether that was the purpose in the beginning is not, perhaps, clear, but that the purpose existed in the end there can be no doubt, and as there can be no controversy as to the Vincennes and Indianapolis cases, it is sufficient to say as to the Terre Haute case that when Mr. Claybrooke informed the parties that the property was in possession of the court, they refused to restore it to the receiver, but still wrongfully retained it.

There is no escape, therefore, from this position, notwithstanding that after a time the strikers at Terre Haute were willing that the Logansport road should run; that they seized and obstructed the running of the road in the earlier stages of the proceedings, and therefore were guilty of a violation of the law and of interference with the property of the court. If the court had any doubt in any of these cases as to the direct interference of these defendants, the court would not punish; but there can be no doubt, fairly and candidly considering the evidence, that all of the other defendants now before the court did illegally participate in the act of obstructing the trains in the control of the receivers, and so were guilty of disobedience of the orders of this court. But as I have said, this proceeding is summary, and therefore the court is always inclined in cases of this sort, to mild, rather than harsh judgment upon the parties. If the court had jurisdiction of the general offense which was committed, and you were on trial before this court for that, the punishment would be greater than it will be in this particular case, because, I repeat, it is a very great offense against society, and against the interest and prosperity of the country that has been committed.

Suppose that upon any of these trains there was money or property which was to save a man's farm or house from loss or sacrifice. Suppose that there was a traveler who was going to the bedside of a dying wife, husband, son or daughter. You see how you may have interfered with everything that we hold most precious as citizens of this country; and the mails, the mode of communication, you arrested even them, because you arrested the trains by which they were carried.

It is almost impossible to conceive of the infinite injury which may attend the stoppage of the railroad trains in our country, even for a day; much less a week. This being so, whatever may be the feeling in the community—that perhaps railroad employés ought to receive more than they do receive—still it is not in this way that it is to be remedied, because you make war upon society, and society will always arise under such circumstances against those who make war upon it. It is not possible that any one class of men can arise against a whole community, and seek to enforce its claims by violence and wrong, and expect that society will not re-assert its abused rights. It will as long as society exists.

Railroad employés must recollect that other people have rights as well as they, they have acted recently as though no one else had any rights except themselves. Merchants have

rights, professional men have rights, farmers have rights, and even railroad companies have rights. All men and all corporations have their rights under the law.

It is not the desire of this court personally to punish any one of these defendants. The only object which the court has in view is to stop, so far as it can, any interference with the property under its control, and which it holds as a trust, and that must be done and an example must be made to show that this interference cannot occur again without a certainty that the parties who are guilty will suffer punishment. The court will make the punishment as light as possible under the circumstances, but there must be a penalty imposed. Very few of you made any complaint on your own account of the receivers of the road in the possession of the court; it was almost entirely an interference from outside parties.

It is true, perhaps, that some of you have been more guilty than others, some of you have taken a more active part in these wrongful acts than others, but it is difficult for the court to make a discrimination, and the punishment will be only such as the court thinks the person who is least guilty ought to receive. The defendants will be imprisoned three months each, subject to the further order of the court.

See, also, Secor v. Toledo, P. & W. R. Co. [Case No. 12,605].