## THE NAVEMAR.

### COMPANIA ESPANOLA DE NAVEGA-CION MARITIMA, S. A., v. CRESPO et al.

### No. A–15102.

District Court E. D. New York.

Dec. 22, 1936.

Bigham, Englar, Jones & Houston, of New York City (James W. Ryan, of New York City, of counsel), for libelant.

Thomas A. McDonald, of New York City (John J. Heckman, of New York City, of counsel), for members of the crew.

GALSTON, District Judge.

An order was obtained by the libelant calling upon the respondents to show cause why they should not be punished for contempt in failing to obey the decree in this cause filed on December 14, 1936.

On December 7, 1936, the libel was filed, and alleges, among other things, that the members of the crew of the steamship Navemar, the respondents cited in this order to show cause, unlawfully deprived the libelant of the possession of the steamship Navemar and seized the vessel while the master was temporarily on shore, and threatened to detain the master if he should again return to the steamship and seek to exercise any authority on behalf of the libelant.

The libel sought to have the respondents named therein, and any and all other persons who claimed to have an interest in the steamship Navemar, show cause why possession of the steamship should not be delivered to the libelant as the owner thereof.

No answer having been filed by any of the respondents or by any claimant, the libelants adduced proof in support of the allegations of the libel and procured accordingly a default decree on December 14, 1936. This decree adjudged the libelant to be entitled to the Navemar and directed the marshal to deliver possession of the ship to the libelant. The decree contained also the following provision: "Further ordered, adjudged and decreed that any and all persons now on board the Spanish steamship 'Navemar' who claim any interest in her adverse to the libellant, or whom the libellant desires to have removed from

the said Spanish steamship 'Navemar,' be and they hereby are directed to leave the Spanish steamship 'Navemar.'"

Affidavits in support of this motion are made by Marcelino Garcia, Jr., a representative of the libelant, and Manuel Noriega, an interpreter who accompanied Captain Martinez, Chief Engineer Lecumberri, and Garcia. From these affidavits it appears that on reaching the deck they were met by the chief deputy United States marshal for the Eastern District of New York and another deputy marshal. On deck there were also three or four police officers of the City of New York. At the request of the chief deputy United States marshal, the interpreter explained to the members of the crew present that the chief deputy marshal had an order from this court to execute, and that all members of the crew should be present when the order was read. At that time the respondent Arturo Garcia, second engineer, stated that the most important members of the crew were ashore, referring, so the Noriega affidavit says, to the "committee and the master" of the boat." There ensued a colloquy between this second engineer and Captain Manuel Martinez in which the latter claimed to be master of the Navemar. Garcia disputed that assertion and stated that the crew did not recognize him as such and moreover that they had their own master.

The Noriega affidavit continues by averring that thereafter the crew on board the Navemar having been assembled, the order of the court, as translated into the Spanish language, was read by him in its entirety to the respondents. Noriega alleges that at the marshal's instruction he requested the crew to leave the boat, and added that the master, the chief engineer, and Mr. Garcia, Jr., were taking possession for the owner. Thereupon Arturo Garcia, speaking for the crew, contended that they would not obey any order excepting that of the Spanish Consul or of the ship's committee, and that they "would resist by force any effort of anybody else to take possession of the 'Navemar.'"

It appears also from the Noriega affidavit that the chief deputy marshal, having been informed of the crew's answer, maintained that he had discharged his mission by giving libelants possession of the boat. Noriega protested that the marshal was not delivering possession to the libelant because he had not compelled those persons claiming possession against the libelants to leave the ship. After further discussion the marshals left the vessel, as did the two affiants.

The affidavit of Arturo Garcia, filed on behalf of the respondents, admits that he acted as spokesman for the members of the crew. The affidavit is not entirely satisfactory because it certainly does not meet the averment in the Noriega affidavit that Arturo Garcia contended that the crew "would resist by force any effort of anybody else to take possession of the 'Navemar,'" although Garcia does admit that he told Noriega: "We could not recognize his authority over that of the Spanish Consul, who has complete control over the officers and crews of Spanish steamships in foreign ports."

Garcia further says that he did not think that he was disobeying any order of this court "because I was not told that the court requested our appearance in court." Of course, that is wholly irrelevant, for the decree did not request the presence of the crew in court. Apparently, though, Garcia was not clear in his own mind as to what was going on, for he says: "The only dispute which arose was whether or not we, as crew, would recognize Martinez as master of the 'Navemar.'"

From the affidavit of Louis Careaga, Acting Consul General in New York for the Republic of Spain, it appears that on December 7, 1936, he removed Manuel Martinez as master of the Navemar because of acts of insubordination, and that on the same day he appointed Tomas Pascual Peris master of the steamship. Mr. Careaga says: "At no time was I advised by anyone that this Honorable Court had issued any orders requesting the members of the crew of the Spanish steamship 'Navemar' to leave that ship for any reason. Up to the time that the United States marshal and the former Captain Martinez went on board the 'Navemar' on December 14, 1936, I had not rescinded my orders that the officers and crew of the steamship 'Navemar' should remain on board the ship. Any misinterpretation that might have arisen I am sure must be due to conflict of laws involved in the case."

The concluding affidavit submitted by the respondents is that of Thomas A. McDonald, the attorney for members of the crew. Mr. McDonald recites that he was informed by Mr. Lindsey, chief deputy

United States marshal, that he had not ordered the crew of the steamship Navemar to leave the vessel, and "when he left the said vessel there were no orders which he had given which were not obeyed."

Various exhibits are submitted in reply by the libelant, among which is the chief deputy marshal's return. The return recites: "I then told the crew that the libellants, the Compania Espanola de Navegacion Maritima, S. A. were in possession of the steamship 'Navemar' and from then on Captain Martinez was in charge of the steamship 'Navemar' on behalf of the libellant. I had my aforesaid statement translated to the Spanish language to the crew by the interpreter Manuel Noriega."

Two questions are thus presented:

First, did the respondents violate the terms of the decree?

Secondly, if there was a violation of the decree, is such violation to be described as a civil or a criminal contempt?

This second question was not discussed in the argument on the return, nor in the libelant's brief, which is the only brief filed. The question is, however, of primary importance.

Title 28 U.S.Code, § 385 (28 U.S.C.A. § 385), provides: "(Judicial Code, section 268.) Administration of oaths; contempts. The said courts shall have power to impose and administer all necessary oaths, and to punish, by fine or imprisonment, at the discretion of the court, contempts of their authority. Such power to punish contempts shall not be construed to extend to any cases except the misbehavior of any person in their presence, or so near thereto as to obstruct the administration of justice, the misbehavior of any of the officers of said courts in their official transactions, and the disobedience or resistance by any such officer, or by any party, juror, witness, or other person to any lawful writ, process, order, rule, decree, or command of the said courts. (R.S. § 725; Mar. 3, 1911, c. 231, § 268, 36 Stat. 1163.)"

From the foregoing it appears then that this court has power to punish by fine or imprisonment the disobedience or resistance of any person to any lawful decree of the court, but the machinery to be employed—in other words, the practice which must be followed in enforcement thereof —is another matter and has been the subject of authoritative decision. In Gompers et al. v. Buck's Stove & Range Co., 221 U.S. 418, 31 S.Ct. 492, 498, 55 L.Ed. 797, 34 L.R.A.(N.S.) 874, the court considered a judgment of the Supreme Court of the District of Columbia which provided punishment by imprisonment of an alleged contempt of an injunction against the continuance of a boycott. This judgment was reversed by the United States Supreme Court because a punitive sentence, appropriate only to a proceeding at law for criminal contempt where the contempt consisted in doing that which had been prohibited by an injunction, could not properly be imposed in contempt proceedings which were instituted, entitled, and treated as part of the original cause. In the effort to classify contempts the court said: "Contempts are neither wholly civil nor altogether criminal. And 'it may not always be easy to classify a particular act as belonging to either one of these two classes. It may partake of the characteristics of both.' Bessette v. W. B. Conkey Co., 194 U.S. [324] 329, 24 S.Ct. 665, 48 L.Ed. 1002. But in either event, and whether the proceedings be civil or criminal, there must be an allegation that in contempt of court the defendant has disobeyed the order, and a prayer that he be attached and punished therefor. It is not the fact of punishment, but rather its character and purpose, that often serve to distinguish between the two classes of cases."

The court continued: "If it is for civil contempt the punishment is remedial, and for the benefit of the complainant. But if it is for criminal contempt the sentence is punitive, to vindicate the authority of the court. It is true that punishment by imprisonment may be remedial as well as punitive, and many civil contempt proceedings have resulted not only in the imposition of a fine, payable to the complainant, but also in committing the defendant to prison. But imprisonment for civil contempt is ordered where the defendant has refused to do an affirmative act required by the provisions of an order which, either in form or substance, was mandatory in its character. Imprisonment in such cases is not inflicted as a punishment, but is intended to be remedial by coercing the defendant to do what he had refused to do. The decree in such cases is that the defendant stand committed unless and until he performs the

affirmative act required by the court's order."

It is significant, in the proceeding here pending, that not only is it entitled in the main cause but also that on the return it was argued that "the court should assert its authority and unless good cause is shown here, should punish these men with an adequate punishment such that this kind of thing won't happen again in New York Harbor." Thus, applying the test suggested in the foregoing quotation from the opinion of Mr. Justice Lamar, the object of the punishment apparently is not remedial and for the benefit of the complainants but "is punitive, to vindicate the authority of the court."

Of course, the incidental punishment by incarceration is in part remedial for the benefit of the complainant, since during the period of imprisonment it would be impossible for the respondents to persist in contumacious conduct. But primarily the imprisonment would operate as a punishment for the completed act of disobedience.

I believe, therefore, that the nature of the alleged contempt is not civil but criminal. If that be so, then it follows, as was stated in the same opinion by Mr. Justice Lamar: "If, then, as the court of appeals correctly held, the sentence was wholly punitive, it could have been properly imposed only in a proceeding instituted and tried as for criminal contempt."

And it was further stated that "it is certain that in proceedings for criminal contempt the defendant is presumed to be innocent, he must be proved to be guilty beyond a reasonable doubt, and cannot be compelled to testify against himself. Boyd v. United States, 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746; United States v. Jose [C.C.] 63 F. 951; State v. Davis, 50 W. Va. 100, 40 S.E. 331, 14 Am.Crim.Rep. 282; King v. Ohio & M. R. Co., 7 Biss. 529, Fed.Cas. No. 7,800; Sabin v. Fogarty [C.C.] 70 F. 482; Drakeford v. Adams, 98 Ga. 724, 25 S.E. 833."

■ Another important difference is that proceedings at law for criminal contempt "are between the public and the defendant, and not a part of the original cause."

In this circuit, in Golub v. Guzzardi (C. C.A.) 74 F.(2d) 671, 672, it was stated: "The great importance attached to the characterization as criminal of a proceeding to punish for contempt, dates from Gompers v. Buck's Stove Co., 221 U.S. 418, 31 S.Ct. 492, 55 L.Ed. 797, 34 L.R.A. (N.S.) 874, before which the practice had been looser. The Supreme Court there set out the elements which persuaded it that that proceeding had been civil. We read the opinion, not as making crucial any one detail, but rather as summing up the features of a portrait which as a whole was plainly recognizable."

Judge Learned Hand remarks: "It is perhaps a misfortune that the result should depend upon the form of the proceeding."

From the foregoing discussion I cannot help but conclude that if there was a contempt by these respondents the United States must in some form be a party to the proceedings to punish.

Something, however, may be said about the merits. Though in the Noriega affidavit it appears that at the marshal's instruction he requested the crew to leave the boat, there is no mention of such instruction made in the marshal's return. The McDonald affidavit quotes the deputy marshal as saying that he had not ordered the crew of the steamship Navemar to leave the vessel, and moreover that when Lindsey left the vessel, "there were no orders which he had given which were not obeyed."

Apparently, then, the marshal was content with the reading of the decree. There was no physical resistance by the respondents. Had there been a refusal to a direct request by the marshal that the respondents leave, he was well fortified under federal statute to carry out the process of the court. Title 28 U.S.Code, § 504 (28 U.S.C.A. § 504), provides that marshals and other deputies shall have the same powers in each state in executing the laws of the United States as the sheriffs and their deputies in such state may have in executing the laws thereof. See Agnello v. U. S. (C.C.A.) 290 F. 671.

The motion must be denied, but without prejudice. Settle order on notice.