# RE GOMPERS.

CONTEMPT; BOYCOTT; INJUNCTION; CONSTITUTIONAL LAW; FREEDOM OF
    SPEECH AND PRESS;. TRIAL; JUDGMENT; LIMITATIONS OF ACTIONS;
    LACHES; PENALTIES; APPEAL AND ERROR.

1. A decree enjoining a labor organization and its officers from boycotting
    the business or products of an employing manufacturer, and from
    publishing in its official organ or elsewhere his name in its "We

Don't Patronize" or "Unfair" list, and from making any written or oral statement calling attention to the fact that a boycott had been waged or his products declared unfair, is not void as abridging the right of free speech and the freedom of the press. (Following *Gompers* v. *Buck's Stove & Range Co.* 33 App. D. C. 516.)

2. A decree enjoining a boycott by a labor organization, and forbidding the publication of an employing manufacturer's name on its "We Don't Patronize" or "Unfair" list, continues in force notwithstanding its modification on appeal, where the decree as modified was never certified back to the trial court for entry.

3. An officer of a labor organization who is enjoined from boycotting the business or products of an employing manufacturer, and from publishing in its official organ or elsewhere his name in its "We Don't Patronize" or "Unfair" list, and from making any written or oral statement calling attention to the fact that a boycott had been waged or its product declared unfair, may be found guilty of contempt in publishing defiant articles which kept the attention of the public fixed on the fact that the boycott had been waged and the products declared unfair, though the producer's name was removed from the list after the injunction became effective, and though it does not appear that the boycott thereafter continued. (Citing *American Federation of Labor* v. *Buck's Stove & Range Co.* 33 App. D. C. 83, 32 L.R.A.(N.S.) 748.)

4. A boycott by a labor organization against the products of an employing manufacturer is continued by a resolution passed at a convention of the organization, subjecting members to a fine and expulsion for non-payment thereof in case they purchase the manufacturer's products, so as to render guilty of contempt for the violation of an injunction against the boycott, an officer of the organization who confessedly bears a share of the responsibility for the passage of the resolution, in that he presided at the convention which adopted it. (Citing *Gompers* v. *Buck's Stove & Range Co.* 33 App. D. C. 516.)

5. Objections to the admission and rejection of testimony without specific assignments of error will not be examined on an appeal from a judgment, unaccompanied by findings of fact, adjudging one guilty of contempt in general, in a proceeding tried by the court, where there is sufficient evidence to support the judgment.

6. On an appeal from a judgment in a proceeding tried by the court, finding one guilty of contempt in general, objections to the admission and exclusion of testimony, in the absence of specific assignments of error, will be deemed to have been waived, where they are so indefinite that counsel seemed not to think them sufficient to require argument.

Proceedings for contempt are *sui generis*, partaking of some of the elements of both civil and criminal proceedings, but, strictly speaking, they are neither civil nor criminal, but belong to a class of proceedings inherent in the court and deemed essential to its existence.

8. Section 725, U. S. Rev. Stat. U. S. Comp. Stat. 1901, p. 583, does not confer jurisdiction, but merely limits the inherent power to Federal courts to punish contempt, and prescribes the punishment. (Citing *Pierce* v. *United States*, 37 App. D. C. 582.)

9. The report of a committee appointed by the court to ascertain if there is reasonable cause to believe that contempt has been committed by a violation of the court's injunction is not a criminal information which will bring contempt proceedings instituted thereon within the purview of sec. 1044, U. S. Rev. Stat. U. S. Comp. Stat. 1901, p. 725, limiting the time within which informations may be instituted.

10. Criminal contempt is not a crime within the meaning of sec. 1044, U. S. Rev. Stat., providing that no person shall be prosecuted for an offense unless the indictment is found or the information is instituted within three years after the commission of the offense. (Mr. Chief Justice SHEPARD dissenting.)

11. Lapse of nearly three years since original contempt proceedings were instituted does not constitute laches which will preclude further proceedings, where the original proceedings were instituted without delay, and, upon reversal upon appeal and remandment for such further proceedings as might seem advisable, the further proceedings were instituted with extreme promptness.

12. The supreme court of the District of Columbia is a single court of general jurisdiction, and the mere fact that the various jurisdictions are by the rule divided and assigned to different judges does not in any way affect the general jurisdiction of the court.

13. Contempt proceedings for the violation of an injunction issued by the supreme court of the District of Columbia, when certified back to that court by this court for dismissal without prejudice, may be certified by the equity division which issued the injunction, to the other equity division, and further proceedings may be therein instituted.

14. An objection to the appointment of a United States Commissioner to take testimony in contempt proceedings in the supreme court of the District of Columbia, for the violation of an injunction issued by it will not be considered on appeal where all testimony was taken in open court.

15. A suggestion by a committee of the bar appointed by the court, that

respondents in contempt proceedings for the violation of an injunction make apology and give assurance of such future submission to the court as would answer the purpose of vindicating its authority; the willingness of the court up to the time of pronouncing sentence to accept a compliance with the suggestion as a purging of the respondents of contempt; and the fact that the suggestion was met with defiance,—are elements to be considered in measuring the respondents' intent and temper. (Mr. Chief Justice SHEPARD dissenting.)

16. A writ of error is not essential to the review by this court of a judgment of the supreme court of the District of Columbia in contempt proceedings, where the judgment shows on its face an abuse of discretion.

17. A judgment of the supreme court of the District of Columbia punishing a person for contempt may be modified by this court for excessiveness, as constituting an abuse of discretion, in view of 27 Stat. at L. 434, chap. 74, creating the latter court, and giving it power to affirm, reverse, or modify on appeal a final order, judgment, or decree of the supreme court. (Citing *Billings* v. *Field,* 36 App. D. C. 16, and distinguishing *Gompers* v. *Buck's Stove & Range Co.* 33 App. D. C. 516.)

18. In the absence of reversible error in the trial below, this court, having the power to reduce the punishment, will not reverse a judgment for contempt and order a new trial upon the ground of excessive punishment, but will modify the decree by fixing a reasonable punishment.

19. Imprisonment for one year, six months and three months respectively, imposed upon officers of a labor organization in contempt proceedings, for the violation of an injunction against boycotting and blacklisting an employing manufacturer, was deemed excessive and was modified on appeal in view of the fact that under sec. 5399, U. S. Rev. Stat. U. S. Comp. Stat. 1901, p. 3656, the maximum penalty that could be imposed in a criminal prosecution for the same acts is $500 or imprisonment for three months, or both; and the further fact that the dispute was adjusted and the boycott terminated before the trial below; and this court ordered the imprisonment of the leading contemner for thirty days, and the imposition upon each of the others of a fine of $500, with a provision for their confinement in case of their failure to pay the fine.

No. 2477.   Submitted February 26, 1913.   Decided May 5, 1913.

HEARING on an appeal by the respondents from three separate judgments of the Supreme Court of the District of Columbia convicting them of contempt of court and imposing a punishment.                        *Modified.*

The Court in the opinion stated the facts as follows:

This is an appeal from three separate judgments of the supreme court of the District of Columbia adjudging appellants, Samuel Gompers, John Mitchell, and Frank Morrison, respectively, guilty of contempt of court. The cases were tried together, and, by stipulation, brought here upon the same record. The appellants will be referred to hereafter as respondents.

It appears that on the 19th day of August, 1907, a bill in equity was filed in the supreme court of the District of Columbia by the Buck's Stove & Range Company, a corporation, of St. Louis, Missouri, praying for an order of injunction to retrain the American Federation of Labor and certain persons, among whom were these respondents, from conducting a boycott against the business of said company. On the 18th day of December, 1907, a temporary restraining order, which is inserted in the margin, was entered by the court.*

The indemnifying bond required by the court to be given by the complainant company was filed on December 23, 1907. The

_____

\* "This cause coming on to be heard upon the petition of the complainant for an injunction *pendente lite* as prayed in the bill, and the defendants' return to the rule to show cause issued upon the said petition, having been argued by the solicitors for the respective parties and duly considered, it is thereupon by the court, this 18th day of December, A. D. 1907, ordered that the defendants, the American Federation of Labor, Samuel Gompers, Frank Morrison, John B. Lennon, James Duncan, John Mitchell, James O'Connell, Max Morris, Denis A. Hayes, Daniel J. Keefe, William D. Huber, Joseph F. Valentine, Rodney L. Thixton, Clinton O. Buckingham, Herman C. Poppe, Arthur J. Williams, Samuel R. Cooper, and Edward L. Hickman, their and each of their agents, servants, attorneys, confederates, and any and all persons acting in aid of or in conjunction with them or any of them, be, and they hereby are, restrained and enjoined until the final decree in said cause, from conspiring, agreeing, or combining in any manner to restrain, obstruct, or destroy the business of the complainant, or to prevent the complainant from carrying on the same without interference from them or any of them, and from interfering in any manner with the sale of the product of the complainant's factory or business by defendants or by any other person, firm, or corporation, and from declaring or threatening any boycott against the complainant or its business, or the product of its factory, or against any person, firm, or corporation engaged in handling or

temporary order of injunction was made permanent as to the
original defendants on March 23, 1908. From the order mak-
ing the injunction perpetual, an appeal was taken to this court.
No supersedeas bond was given, nor any action taken by defend-
ants to stay the judgment. This court modified the decree of
the court below. *American Federation of Labor* v. *Buck's
Stove & Range Co.* 33 App. D. C. 83, 32 L.R.A.(N.S.) 748.
On application of the appellant Federation of Labor, the man-
date was stayed pending an appeal to the Supreme Court of the
United States. Before the case came on for hearing in that
court, the differences between the parties to the injunction pro-
ceeding were settled, and the appeal was finally dismissed. In-
asmuch as the decree as modified by this court was never certi-
fied back to the supreme court of the District for entry, the
original order of injunction remained in full force until the
date of settlement, July 20, 1910.

---

selling the said product, and from abetting, aiding, or assisting in any
such boycott, and from printing, issuing, publishing, or distributing
through the mails or in any other manner any copies or copy of the
American Federationist, or any other printed or written newspaper, maga-
zine, circular, letter, or other document or instrument whatsoever, which
shall contain or in any manner refer to the name of the complainant, its
business, or its product in the 'We Don't Patronize' or the 'Unfair' list of
the defendants or any of them, their agents, servants, attorneys, confed-
erates, or other person or persons acting in aid of or in conjunction with
them, or which contains any reference to the complainant, its business, or
product in connection with the term 'Unfair' or with the 'We Don't Patron-
ize' list, or with any other phrase, word, or words of similar import, and
from publishing or otherwise circulating, whether in writing or orally, any
statement or notice of any kind or character whatsoever, calling attention
of complainant's customers or of dealers or tradesmen or the public, to
any boycott against the complainant, its business, or its product, or that
the same are, or were, or have been, declared to be 'unfair,' or that it should
not be purchased or dealt in or handled by any dealer, tradesman, or other
person whomsoever, or by the public, or any representation or statement of
like effect or import, for the purpose of or tending to any injury to or
interference with the complainant's business, or with the free and unre-
stricted sale of its product, or of coercing or inducing any dealer, person,
firm, or corporation, or the public not to purchase, use, buy, trade in, deal
in, or have in possession stoves, ranges, heating apparatus, or other product
of the complainant, and from threatening or intimidating any person or

Contempt proceedings for the violation of the order of injunction were originally instituted against these respondents on July 20, 1908. From a judgment of conviction, appeal was taken to this court, where the judgment of the court below was affirmed. *Gompers* v. *Buck's Stove & Range Co.* 33 App. D. C. 516. The case was taken to the supreme court, where the judgment was reversed, "and the case remanded with directions to reverse the judgment of the supreme court of the District of Columbia and remand the case to that court with direction that the contempt proceedings instituted by the Buck's Stove & Range Company be dismissed, but without prejudice to the power and right of the supreme court of the District of Columbia to punish, by a proper proceeding, contempt, if any, committed against it." 221 U. S. 418, 55 L. ed. 797, 34 L.R.A. (N.S) 874, 31 Sup. Ct. Rep. 492.

On May 16, 1911, cognizance of the alleged contempt was

persons whomsoever from buying, selling, or otherwise dealing in the complainant's product, either directly, or through orders, directions, or suggestions to committees, associations, officers, agents, or others, for the performance of any such acts or threats as hereinabove specified, and from in any manner whatsoever impeding, obstructing, interfering with, or restraining the complainant's business, trade, or commerce, whether in the State of Missouri, or in other States and territories of the United States, or elsewhere wheresoever, and from soliciting, directing, aiding, assisting, or abetting any person or persons, company or corporation, to do or cause to be done any of the acts or things aforesaid.

"And it is further ordered by the court that this order shall be in full force, obligatory and binding upon the said defendants, and each of them, and their said officers, members, agents, servants, attorneys, confederates, and all persons acting in aid of or in conjunction with them, upon the service of a copy hereof upon them or their solicitors or solicitor of record in this cause: Provided the complainant shall first execute and file in this cause, with surety or sureties to be approved by the court or one of the justices thereof. an undertaking to make good to the defendants all damage by them suffered or sustained by reason of wrongfully and inequitably suing out this injunction, and stipulating that the damages may be ascertained in such manner as the justice of this court shall direct, and that, on dissolving the injunction, he may give judgment thereon against the principal and sureties for said damages in the decree itself dissolving the injunction.

"(Signed) Ashley M. Gould, Justice."

again taken by the supreme court of the District of Columbia by the appointment of J. J. Darlington, Daniel Davenport, and James M. Beck, members of the bar of the supreme court of the District, to inquire whether reasonable cause existed to believe respondents guilty of contempt, and, if so, to prepare, file, present, and prosecute against them "charges of contempt of court, to the end that the authority of the court be established, vindicated, and sustained." The court subsequently added to this committee Clarence R. Wilson, United States attorney for the District of Columbia. The committee, on June 26, 1911, filed a separate sworn report as to each respondent, charging him with contempt of court.

Respondent Gompers is accused of violating the temporary and perpetual orders of injunction in sixteen separate charges, the material part of which is printed in the margin.*

---

* "There is reasonable cause to believe, and it is hereby charged, that the said Samuel Gompers was guilty of contempt in wilfully violating the terms of the said injunction in the following particulars:

"I. After passage by the court of its said decree of injunction of December 18, 1907, and the knowledge of it upon the part of the said Samuel Gompers, he caused a large number, to wit, more than 10,000 copies, of the January, 1908, number of the American Federationist, which was the official journal of the American Federation of Labor, and of which he was the editor, to be issued and published in advance of its usual date of issue, for the express and admitted purpose on his part to anticipate the filing of the required injunction undertaking, in which January, 1908, issue of the said Federationist, the name of the Buck's Stove & Range Company was published, as he well knew, in the 'We Don't Patronize' or 'Unfair' list of the American Federation of Labor. A large number, to wit, many thousands of copies, of the said January American Federationist, were wilfully caused and procured by the said Samuel Gompers to be deposited in the United States mails, on the day immediately preceding the filing of the said undertaking, while many other thousands of copies of this said publication were by him wilfully caused and procured to be delivered to the American News Company as his agent, or as the agent of his codefendant the American Federation of Labor, of which he was president, for the purpose on his part of being distributed to the public, which distribution by his said agency and agencies he wilfully took no steps to stop or have discontinued after knowledge by him of the giving of the said injunction bond, and that the injunction granted by the court had thereby become technically operative and effective. The said Samuel Gompers wilfully

Respondent Morrison is charged, as secretary of the American Federation of Labor, with receiving and having in his custody and circulating the reports of the Norfolk Convention; of joining with the other respondents in sending out the "Urgent Appeal," with the editorial of Gompers thereto attached,

---

hurried, and in the said equity cause expressly admitted that he hurried, the issue of the January, 1908, number of the Federationist, for the express purpose of getting it out before the undertaking was filed; he hurried up the issue because of the possibility that the complainant would give the undertaking; that his purpose was to affect the complainant's business by influencing his fellow workmen and the labor unions to prevail upon the complainant to come to an agreement; that he hoped to lessen its business until he did come to such an agreement, which was the purpose of the boycott; that he anticipated that the injunction would soon become operative, and was diligent to see that the issue was distributed before it was done; and that for this purpose he placed a large number of copies in the hands of the Washington News Company for distribution, neither informing that company that the injunction order had been signed and might become operative, nor taking any steps to prevent it from circulating the copies after he learned that the injunction undertaking had been given; that he had hurried the issue because he wished to get the issue out before the injunction became operative, in order that the complainant's name might continue to be published in connection with the 'We Don't Patronize' caption without the interference of anyone, including the court, and that he did so hoping, and with the purpose, that the effect might lessen the business of the complainant until it came to such an agreement, which was the original purpose of the boycott.

"II. After the filing of the said injunction undertaking, and knowledge thereof upon the part of the said Samuel Gompers, he wilfully caused and permitted the further circulation, both through the United States mails and otherwise, of the said January, 1908, number of the American Federationist, containing the name of the Buck's Stove & Range Company in the 'We Don't Patronize' or 'Unfair' list of the American Federation of Labor, as he at the time well knew, and for the circulation of which journal he admitted in the said equity cause that he was responsible.

"III. On and after the 23d day of December, 1907, the said Samuel Gompers, who was both the president and the general representative of the American Federation of Labor, wilfully caused and permitted to be publicly circulated a large number, to wit, several thousands of copies, of the printed proceedings of the convention of the said American Federation of Labor held at Norfolk, Virginia, in the month of November, 1907, which printed proceedings, so by him caused and permitted to be published and circulated, not only contained and referred to the name of the Buck's

and of circulating the American Federationist for the months of January, February, March, April, May, June, and September, 1908, containing the editorial and other matter relating to the Buck's Stove & Range Company, as set forth in the various charges against the respondent Gompers.

Stove & Range Company, its business, and product in connection with the 'We Don't Patronize' or 'Unfair' list of the said American Federation of Labor, as he at the time knew, but, in addition thereto, contained the following, as he then knew:

"(a) A report by the said Samuel Gompers to the said convention of the American Federation of Labor, containing, *inter alia,* the following:

" 'Recently one of the branches of the Federal courts decided by a majority vote that the boycott is illegal. * * * We should demand the change of any law which curbs the privilege and the right of the workers to exercise their normal and natural preferences. In the meantime, we should proceed as we have of old, and, wherever a court shall issue an injunction restraining any of our fellow workers from placing a concern hostile to labor's interests and themselves on our "Unfair" list, and enjoining the workers from issuing notices of this character, the further suggestion is made that upon any letter or circular issued upon a matter of this character, after stating the name of the unfair firm and the grievance complained of, the words "We have been enjoined by the courts from boycotting this concern," could be added with advantage.'

"(b) An editorial written and published by the said Samuel Gompers, and of which he wilfully had more than 30,000 copies distributed all through the country, which said editorial was originally published in the February, 1908, issue of the American Federationist, containing, *inter alia,* the following:

" 'Justice Gould, of the supreme court of the District of Columbia, issued an injunction, on December 18, 1907, against the American Federation of Labor and its officers and all persons within the jurisdiction of the court.

" 'This injunction enjoined them as officers or as individuals, from any reference whatsoever to the Buck's Stove & Range Company's relations to organized labor, to the fact that the said company is regarded as unfair; that it is on an "Unfair" list, or on the "We Don't Patronize" list, of the American Federation of Labor. The injunction orders that the facts in controversy between the Buck's Stove & Range Company and organized labor must not be referred to, either by printed or written word or orally. The American Federation of Labor and its officers are each and severally named in the injunction. This injunction is the most sweeping ever issued.

Respondent Mitchell, as vice president of the American Federation of Labor, is charged, with the other respondents, of publishing and circulating the "Urgent Appeal," with the Gompers editorial; and of presiding over the annual convention of the United Mine Workers of America in January, 1908, when a

" 'It is an invasion of the liberty of the press and the right of free speech.

" 'On account of its invasion of these two fundamental liberties, this injunction should be seriously considered by every citizen of our country.

&ast;          &ast;          &ast;          &ast;          &ast;          &ast;

" 'With all due respect to the court, it is impossible for us to see how we can comply with all the terms of this injunction. We would not be performing our duty to labor and to the public without discussion of this injunction. A great principle is at stake. Our forefathers sacrificed even life in order that these fundamental constitutional rights of free press and free speech might be forever guaranteed to our people. We would be recreant to our duty did we not do all in our power to point out to the people the serious invasion of their liberties which has taken place. That this had been done by judge-made injunction, and not by statute law, makes the menace all the greater.

&ast;          &ast;          &ast;          &ast;          &ast;          &ast;

" 'The publication of the Buck's Stove & Range Company on the "We Don't Patronize" list of the American Federation of Labor is the exercise of a plain right. To enjoin its publication is to invade and deny the freedom of the press, a right which is guaranteed under our Constitution.

&ast;          &ast;          &ast;          &ast;          &ast;          &ast;

" 'The matter of attempting to suppress the boycott of the Buck's Stove & Range Company by injunction, while important, yet pales into insignificance before this invasion and denial of constitutional rights.

&ast;          &ast;          &ast;          &ast;          &ast;          &ast;

" 'The members of organized labor are not themselves obliged to refrain from dealing with the firms on the "We Don't Patronize" list of the American Federation of Labor. The information is given them. There is no compulsion. They are entirely free to use their own judgment.

&ast;          &ast;          &ast;          &ast;          &ast;          &ast;

" 'No person can be compelled to buy an article. If the purchaser chooses to let alone certain products for any reason, or for no reason, there is no way of compelling him to buy.

" 'This injunction cannot compel union men or their friends to buy the Buck's stove and ranges. For this reason the injunction will fail to bolster up the business of this firm, which it claims is so swiftly declining.

" 'Individuals, as members of organized labor, will still exercise the right

resolution was introduced and adopted imposing a fine of $5 upon any member of the Union who should purchase the product of the Buck's Stove & Range Company, and providing that, for failure to pay the fine, the member should be expelled from the Union. He is also charged with using the following lan-

to buy or not to buy the Buck's stoves and ranges. It is an exemplification of the saying that "you can lead a horse to water, but you can't make him drink," and more than likely these men of organized labor and their friends will continue to exercise their right to purchase or not to purchase the Buck's stoves and ranges.

" 'It may not be amiss here to say that in all these proceedings, whether before the court or in the contest forced upon labor by the Buck's Stove & Range Company, no element of personal malice or ill-will enters. Labor is earnestly desirous of entering into friendly relations with employers, and this is none the less true of its desire to reach an honorable adjustment and agreement with the Buck's Stove & Range Company. So long, however, as that company continues in its hostile attitude to labor, denying it the right to organize, discriminates against Union members, and refuses to accord conditions of employment generally regarded as fair in the trade, it must expect retaliatory measures; these measures always, however, within the law, and for the purpose of ultimately reaching an honorable, mutually advantageous agreement.

" 'The publication of the Buck's Stove & Range Company on the "We Don't Patronize" list of the American Federation of Labor is only an incident in the history of the case. These stoves might have been let as severely alone by purchasers if they had never been mentioned on that list. It is not the matter of removing that firm from the list against which we primarily protest; it is this injunction invading the freedom of the press.

" 'Justice Gould, in one portion of his opinion, says: "Defendants (the American Federation of Labor) have the right, either individually or collectively, to sell their labor to whom they please, on such terms as they please, and to decline to buy plaintiff's stoves; they have also the right to decline to traffic with dealers who handle plaintiff's stoves." (Heavy type and brackets are ours.)

" 'Here he states precisely the whole case of the American Federation of Labor. This is what we have done. This is the sum total of labor's offending. The publication of the Buck's Stove and Range Company and other firms on the "We Don't Patronize" list is merely giving truthful information at the request of our members as to whether or not certain firms employ union men and concede the other conditions of employment usually granted by those concerns which recognize union labor.

" 'It would seem that, having made the above quoted statement, Justice Gould would have found in it the reason for a refusal to issue the injunc-

guage in a speech delivered before the annual convention of the United Mine Workers of America in January, 1909: "The court says further that I presided as president of the United Mine Workers at a convention here in which a resolution was passed violating that injunction. There are no doubt in this

tion. He, however, goes on to assume that there has been some unwarrantable interference with the plaintiff's business, though neither in his opinion nor in the injunction itself does he make it clear how he arrived at the conclusion that the union course was any other than as indicated in his own language.'

"IV. Following the injunction order of December 18, 1907, an opinion by one of the counsel for the complainant in the said equity cause had been published, to the effect that, although the order of the supreme court of the District of Columbia to punish for contempt of court was limited to such persons as it might at any time find within the territorial limits of the District of Columbia, the decree was binding upon all persons comprised within its terms, wherever they might reside, and that it was a criminal offense under the statutes of the United States, punishable by imprisonment in the penitentiary, for any two or more persons anywhere in the United States to conspire together to evade or defeat the decree by doing any of the acts prohibited by it, and that such persons were liable to prosecution therefor by the Federal authorities. Thereupon, the said Samuel Gompers published in the February, 1908, number of the American Federationist, a copy of the decree of injunction, prefacing it, in large type, with an editorial written by him as follows:

" 'Order Granting Injunction.

" 'In the official organ of the National Association of Manufacturers, one of the counsel for the Buck's Stove & Range Company declares that punishment for violation of the injunction issued by Justice Gould against the American Federation of Labor applies particularly to those within the territorial limits of the District of Columbia who violate the terms of the injunction. That those who violate the terms of the injunction in any other part of the country outside of the District of Columbia can be punished only when they thereafter come within the territorial limits of the District of Columbia. Counsel for the American Federation of Labor assure us that this construction of the court's order is accurate.' "

"The object of the foregoing editorial was, and the said Samuel Gompers expressly admitted it was, to inform the local unions so that they might know 'what they might do and what they might not do;' that the information he wished to convey was that those who violated the injunction could be punished only in case they thereafter came in the said District, and

convention hundreds of delegates who were here a year ago, who know that I had no knowledge that the resolution was to be introduced. They know I had nothing to do with its preparation, with its consideration, or its introduction. It came to us as all other resolutions did. As chairman, what was I to do?

that he thought the opinion of the complainant's counsel would be valuable to the working people, so that they might be guided by it.

"The publication of the said editorial was immediately followed by articles and editorials in the various journals, magazines, or organs published by or in the interest of the numerous affiliated bodies composing the American Federation of Labor, of which the following are examples:

"'All the Justice Goulds' Buck's Stove & Range Company injunctions, and United States Supreme Court judges, with their declarations of the Erdmann law as unconstitutional, will some day be in Heaven or H——, and trade unionism will still flourish, so don't worry.'

> "'Neither Van nor his ally Judge Gould
> 'and the combined forces of Hell,
> 'Can bridle free speech in this country,
> 'And the same old story will tell.'

"'V. On or about the 24th day of January, 1908, the said Samuel Gompers wilfully united with Frank Morrison, John Mitchell, and others in printing and widely circulating a large number, to wit, many thousands, of copies of a paper designated by them "An Urgent Appeal for Financial Aid in Defense of Free Press and Free Speech," and, also, caused the same to be printed in the February, 1908, American Federationist, which "Urgent Appeal," among other things, contained the following language, as he then knew:

"'To All Organized Labor, Greeting:

"'Justice Gould, of the supreme court of the District of Columbia, has issued an injunction against the American Federation of Labor and its officers, officially and individually.

"'The injunction invades the liberty of the press, the liberty of speech.

"'It enjoins the American Federation of Labor, or its officers, from printing, writing, or orally communicating the fact that the Buck's Stove & Range Company has assumed an attitude of hostility toward labor, and that organized labor has made this fact known, and asks our friends to use their influence and purchasing powers with a view of bringing about an adjustment of all matters in controversy between that company and organized labor. The injunction is of the most sweeping character, and it, as well as the suit in connection therewith, must of necessity be contested in the courts, though it reach the highest judicial tribunal of our country.

I had, it is true, three alternatives. I might have resigned the presidency of the United Mine Workers of America; I might have been cowardly and called someone else to the chair, and let him accept the responsibility,—asked some one else to accept the responsibility of what I dared not do myself; or I might have accepted the last alternative. I might have stood

" 'With this is a reprint of an editorial from the February, 1908, Amedican Federationist, entitled "Free Speech, Free Press, Invaded by Injunction against A. F. of L.—A Review and Protest." The editorial contains a full presentation of labor's position in regard to this injunction.'

"The said Samuel Gompers wilfully caused and assisted in causing to be reprinted, and to be circulated with the said 'Urgent Appeal,' and as a part thereof, thousands of copies of the said editorial contained in the February, 1908, American Federationist, referred to in Paragraph III. of this report, and, further, wilfully caused and assisted in causing thousands of copies of the editorial prefixed to the copy of the injunction printed in the said February, 1908, number of the American Federationist, which editorial is set out in Paragraph IV. of this report, to be reprinted for the purpose of circulation, and to be widely circulated throughout the various States and Territories of the United States in conjunction with the said 'Urgent Appeal,' for the purpose of suggesting to the two million members of the American Federation of Labor, and all persons in sympathy with them, that they might violate the said injunction of the court and might defeat its object and purpose without danger of punishment, provided they were not, or should not come, within the territorial limits of the District of Columbia.

"VI. In the March, 1908, number of the American Federationist, the said Samuel Gompers published in the editorial columns the following:

" 'It should be borne in mind that there is no law, aye, not even a court decision, compelling union men or their friends of labor to buy a Buck's stove or range. No, not even to buy a Loewe hat.'

"VII. In the April, 1908, copy of the American Federationist issued after the final decree of this court in the said equity cause in effect making perpetual the injunction *pendente lite* granted by the court on December 1, 1907, the said Samuel Gompers wilfully published editorially the following:

" 'The temporary injunction issued by Justice Gould, of the court of equity of the District of Columbia, in the (Van Cleave) Buck's Stove & Range Company, of St. Louis, against the American Federation of Labor, its officers and all others, has been made permanent. The case will now be carried to the court of appeals of the District of Columbia.

" 'It should be borne in mind that there is no law, aye, not even a court

up before you, and advocated the cause of a company which
was having trouble with its employees. Does the man who re-
spects me least imagine for a moment I would become the advo-
cate and defender of a company that was at variance with its
employees? Would I stand here and fight the cause of a corpo-

decision, compelling union men or their friends of labor to buy a Buck's
stove or range. No, not even to buy a Loewe hat.'

"And in another column of the April, 1908, copy of the Federationist,
the said Samuel Gompers published the following:

" 'Bear in mind that an injunction issued by a court in no way compels
labor or labor's friends to buy the product of the Van Cleave Buck's Stove
& Range Company, of St. Louis. Fellow workers, be true and helpful to
yourselves and to each other. Remember that united effort in the cause
of right and justice must triumph.'

"VIII. In a public address to a large audience of working people in the
city of New York on April 19, 1908, the said Samuel Gompers said:

" 'They tell us that we must not boycott. Well, if the boycott is illegal,
we won't boycott. But I have no knowledge that any law has been passed
or any order issued by any court compelling us to buy, for instance, a
range or a stove from the Buck's Stove & Range Company. You know
that myself and several are enjoined from telling you, and we are not pre-
pared to tell you, that the Buck's Stove & Range Company is unfair.
There are a number of men who have been having suit brought against
them for $240,000. That is not very much, between you and me; but a
few hatters in Danbury, Connecticut, are unfair. I am not prepared to
say that that is in violation,—that they are unfair.

" 'Of course, in the case of the Buck's Stove & Range Company, if I
told you that the Buck's Stove & Range Company was still unfair, when
I got back to Washington tomorrow, or some place where they say people
play checkers with their noses,—well, as I say, I am not prepared to tell
you that these things are unfair. But there is no law, no court decision,
that compels you to buy them, nor does any law compel you to buy any-
thing without the union label.'

"IX. In a public address delivered by the said Samuel Gompers before
a large gathering of working people on or about the 1st day of May, 1908,
in the city of Chicago, Ill., he said:

" 'I might say just parenthetically about the hatters' case that you are
not now permitted to boycott the Loewe hats, but I want to call your
attention to the fact that there is no law compelling you to wear a Loewe
hat, nor has any judge issued a mandamus compelling you to buy a Loewe
hat. That applies equally to Mr. Van Cleave's stoves and ranges. And,
by the way, I don't know why you should buy any of that sort of stuff,

ration that was trying to destroy the unions in its employment ? What could I· do ? What could any self-respecting·man do ? Would he not have done as I did ? It is true that, technically, I was guilty of violating the injunction when I presided over the meeting that adopted this resolution, but I am no more

I don't; but that is a matter to which we can refer more particularly in our organizations.'

"X. In the July, 1908, issue of the American Federationist, the said Samuel Gompers wilfully wrote and published editorially the following:

" 'The supreme court of the District of Columbia has made permanent the injunction issued by Justice Gould enjoining the American Federation of Labor, its officers, its affiliated unions, and their members and friends, from declaring that the Van Cleave Buck Stove & Range Company, of St. Louis, is on the unfair list of the American Federation of Labor, or the publication of that statement in the American Federationist. An appeal will be taken to the court of appeals of the District of Columbia, and, if necessary, to the United States Supreme Court. The injunction does not compel anyone to buy the Van Cleave Buck stoves and ranges, nor has any decree been issued compelling anyone to buy Loewe's hats.'

"XI. In the September, 1908, issue of the American Federationist, the said Samuel Gompers wilfully published editorially the following:   ·

" 'We have also witnessed in the past year most serious judicial invasion and usurpation of individual liberty .and human freedom by the abuse of the writ of injunction.'

" 'An attempt has been made by the abuse of the writ of injunction to deny and prohibit the freedom of speech and the freedom of the press; and men have been cited to show cause why they should not be punished purely for the right of free press and free speech,—rights not only natural and inherent in themselves, but guaranteed by the Constitution of our country, and which our forefathers fought to save, and which a free people never dreamed would ever be placed in jeopardy.'

"XII. In his report to the executive council of the American Federation of Labor, bearing date the 9th day of September, 1908, and which he thereafter caused to be published at page 1001 of the American Federationist for the month of November, 1908, and widely disseminated, the said Samuel Gompers wilfully used the following .language:

" 'Buck's Stove & Range Company Injunction Suit. ·

" 'As you have been previously advised, Vice President Mitchell, Secretary Morrison, and myself have been cited to appear before the supreme court of the District of Columbia to show cause why we should not be pun-

guilty than any other man who was present in the convention at that time. Indeed, I presume that before a jury I would be considered less guilty, because I did not vote for it, and everyone else did. I did not vote for it because I was presiding."

The respondents filed separate pleas, in which they pleaded

ished for contempt for violation of the court's injunction. The petition upon which the Buck's Stove & Range Company asked for our punishment was published in the September issue of the American Federationist, and I suggest that it be read in connection herewith, as it will show to what extent the executive council and officers and members of affiliated organizations and all others are enjoined, and what they are enjoined from doing.

" 'Your attention is especially called to a feature of the case of this injunction. If all the provisions of the injunction are to be fully carried out, we shall not only be prohibited from giving or selling a copy of the proceedings of the Norfolk Convention of the A. F. of L., either a bound or unbound copy; or any copy of the American Federationist for the greater part of 1907, and part of 1908, either bound or unbound; but we, as an executive council, will not be permitted to make a report upon this subject to the Denver Convention. Unless we violate the terms of the injunction, we are prohibited from referring to the case at all, either in our report to the convention or to others, and should a delegate to the convention ask the executive council what disposition has been made or what the status of the case is, we shall be compelled to remain silent. For one, I am unwilling to be placed in such a position. I have neither the inclination nor the intention of violating the process of the court, but I cannot see how it is possible for us to hold up our heads as honest men, and still refuse to give an accounting to our fellow workers, and to the public, as to the status and outcome of this case.'

"XIII. In a public address made by him in the city of Indianapolis, State of Indiana, on the 29th day of September, 1908, the said Samuel Gompers said:

" 'I want to say this to you and to all that it may concern, that so long as I retain my health and my sanity, I am going to speak upon any subject on God's green earth, and, as a citizen of this country and as editor of the American Federationist, the official monthly magazine of the American Federation of Labor, so long as I am indorsed by labor of the United States with the performance of duties of that office, I will discuss every subject which forms itself to my judgment as being just and right. * * * The injunction which Judge Taft issued while upon the bench is now the basis for the injunction against the American Federation of Labor and its officers and the great rank and file of the labor organizations of the country, just as, in issuing the injunction of the Buck's Stove & Range Company quoted in Judge Taft's injunction in support of his, Judge

D. C.]                          Statement of the Case.

not guilty, the bar of the statute of limitations, laches and unreasonable delay in the presentation of the charges. They were tried before five of the six judges of the supreme court of the District of Columbia, and were each found guilty of contempt of court, and sentenced to imprisonment in jail,—Gompers for

---

Gould's position. Do you know that about two weeks ago John Mitchell, Frank Morrison, and I were three of us haled to court to show cause why we should not be punished, why we should not be sent to jail for contempt of court. * * * I want to say to you that if the injunction is strictly construed and enforced, I am in contempt of court again for telling you that, but I propose to discuss this thing, and I do not want to be in contempt of court, but I propose to discuss it. The injunction prohibits me from mentioning the above stove and range company in this case to anybody, either by word of mouth or by letter, or either in letter or circular or any way, but I can't help that. I must discuss it. I will explode if I don't, and I don't want to go to jail, but I prefer that to exploding. I don't know what his Honor, the judge, may do with Frank Morrison and John Mitchell and I. * * * The judge need not give any explanation as to why he finds a man has not shown good cause why he should not be punished for contempt of court. He issues the prescribed injunction to its extent; he hales to the court the man who he charges as having violated it, and then he sets the punishment as his judgment, his opinion. If he has had a good night, he may be lenient with the culprit; if he has had a bad night, Lord pity the poor fellow; and I suppose good and bad nights are frequently controlled by good or bad evenings before the night.'

"XIV. In a public address delivered by him in the city of Baltimore, State of Maryland, on or about the 26th day of October, 1908, the said Samuel Gompers said:

" 'The injunction issued against me by Judge Gould was based on Judge Taft's decisions. By that injunction I am restrained from talking to you about this case. No labor leader can mention it in speech or circular. I am enjoined from telling you I won't buy a Buck's stove or range. But I won't buy one just the same. I am enjoined from telling you there is no law compelling you to buy one; but there isn't such a law.

" 'Because of this case I am on trial, and may have to go to jail. There is no fun in going to jail, and I don't want to go; for no man would feel more keenly the sting of having his liberty restrained. But the whole world would be a narrow cage were I denied the freedom of speech. I say these things with a full consciousness of what the responsibility may be. But jail or no jail, I'm going to discuss the principles of liberty.'

"XV. That, at the public reception tendered him by the labor organizations of the city of Washington in the month of November, 1908, the said Samuel Gompers made an address which he caused to be published in

one year; Mitchel for nine months, and Morrison for six months. From the judgments, separate appeals have been prosecuted, but by stipulation in a single bill of exceptions.

*Mr. Alton B. Parker, Mr. Jackson H. Ralston, Mr. Frederick L. Siddons,* and *Mr. W. E. Richardson* for the appellant.

*Mr. James M. Beck, Mr. Daniel Davenport, Mr. Clarence R. Wilson,* and *Mr. J. J. Darlington,* the members of the committee appointed by the supreme court of the District of Columbia, appeared in this court and argued the appeal in support of the judgments appealed from.

---

the January, 1909, American Federationist, in the course of which he uttered the folowing language:

" 'Now, you know the supreme court of the District of Columbia has issued an injunction against the American Federation of Labor, its executive officers, our affiliated organizations, and their members and friends and sympathizers and agents, attorneys, and counsel, and conspirators and coconspirators, and what not, and among these you are included. The court issued the injunction prohibiting us from publishing, from printing, from writing, from speaking, from whispering that the Van Cleave Buck's Stove & Range Company is unfair to organized labor, and for anyone to publish, to print, to write a letter or to speak of this is violation of the terms of the injunction. Yet the·Constitution of the United States provides that the right of freedom of speech and freedom of the press and public assemblage shall never be denied or abridged. In other words, an injunction of such a character is an invasion of the constitutionally guaranteed rights of every man and woman in this country.

" 'I have said, and I now want to repeat here, not in bravado, but in full consciousness of the responsibility with which the statement may be interpreted, that when it comes to a choice between obeying an injunction denying me the right of free speech, free expression of the thoughts that come to my mind, and which are not in violation of the laws of my country, I shall have no hesitancy in standing upon my constitutional rights. We have a dispute with the Van Cleave Buck's Stove & Range Company; 1 have been enjoined from saying that I won't buy a Buck's stove or range, and I won't, and because I have said this in several ways, by discussion of the case editorially and in the American Federationist, and Frank Morrison has sent out the American Federationist containing these things I have said, and because John Mitchell was presiding over the convention of the United Mine Workers, when a motion was placed

Mr. Justice VAN ORSDEL delivered the opinion of the Court:

We will first consider the assignments of error challenging the sufficiency of the evidence to support the judgments finding respondents guilty of contempt. The commission of the acts charged are not denied; but the defense is interposed in each case that the acts were not committed with intent to disobey the injunction, and further that there is no evidence that the boycott was continued after the temporary order of injunction became effective. In answering these objections, it is proper to examine the order of injunction, to ascertain the extent to which respondents were by its terms restrained. It is not im-

before that body advising the members of the Mine Workers not to buy a Buck's stove or range, we have been charged with contempt,—that is, we have been called upon to show cause why we should not be sent to jail, and I could not show cause.

" 'The things I have been charged with, I did.' I have not denied them. I have discussed them upon the platform, as I discuss them here. I have written circulars about them. Secretary Morrison sent them out, and I ask you now to place yourself in my position, what would you do?'

"XVI. In a report made by the said Samuel Gompers to the convention of the American Federation of Labor held in November, 1909, the following language was used by him, referring to the injunction granted by this court on December 18, 1907:

" 'When a judge so far transcends his authority, and assumes functions entirely beyond his power and jurisdiction; when a judge will set himself up as the highest authority in the land, invading constitutionally guaranteed rights of citizens; when a judge will go so far in opinion, decision, and action, that even judges of the court of appeals have felt called upon to criticize his action, "unwarranted" and "foolish," under such circumstances it is the duty of the citizen to refuse obedience, and to take whatever conseq·ences may ensue.'

"Each and every of the foregoing publications, statements, and acts of the said Samuel Gompers was in wilful violation of the injunction decree of this court in the said equity cause of the *Buck's Stove & Range Co.* v. *American Federation of Labor*, No. 27,305; was done for the purpose of inducing others to disregard and violate the injunction of this court, and thereby to defeat it; and, in each of the said publications, statements, and acts, the said Samuel Gompers is guilty of contempt of the court, and has subjected himself to due punishment therefor.

"With regard to each and every of the acts, statements, and publica-

portant that the order was modified by this court.  Our order, as suggested, never became effective, and, however erroneous the original orders may have been, it was not for respondents to determine that fact, but for the proper appellate tribunal in the orderly and prescribed course of procedure.  "The preliminary injunction was in force until set aside."  *Worden* v. *Searls*, 121 U. S. 14, 27, 30 L. ed. 853, 858, 7 Sup. Ct. Rep. 814.  "If a party can make himself a judge of the validity of orders which have been issued, and by his own act of disobedience set them aside, then are the courts impotent, and what the Constitution now fittingly calls 'the judicial power of the United States'

---

tions above set forth, the said Samuel Gompers asserted, and it may be he then believed, that the injunction was not binding upon him because of what he claimed to be his constitutional right of free speech and a free press; and it may be that, now that this contention upon his part has been determined by the Supreme Court of the United States to be unfounded, he may be prepared to make such due acknowledgment, apology, and assurance of future submission to the court as may sufficiently answer the necessary purpose of vindicating its authority, and that of the law. Should such acknowledgment, apology, and submission not be forthcoming after due notice and opportunity, the course necessary to be pursued, to maintain its dignity and due respect for and obedience to the law, is respectfully submitted to the court for its consideration.

"Joseph J. Darlington,
"James Davenport,
"James M. Beck, Committee.

"District of Columbia, ss:

"I, Daniel Davenport, on oath say that I have read the foregoing report, signed by Joseph J. Darlington, James M. Beck, and myself, committee, and know the contents thereof; that this affidavit is made by me on behalf of the said Joseph J. Darlington and James M. Beck, as well as on my own behalf, because of the fact that the said matters and things in the said report set forth are more largely within my personal knowledge; that the matters and things set forth in the said report as of personal knowledge are true, and that those set forth upon information and belief I believe to be true.

"Dan'l Davenport.

"Subscribed and sworn to before me this 24th day of June, A. D. 1911.

"Irwin H. Linton,
"Notary Public, D. C."

(Seal.)

would be a mere mockery." *Gompers* v. *Buck's Stove & Range Co.* 221 U. S. 418, 450, 55 L. ed. 797, 809, 34 L.R.A.(N.S.) 874, 31 Sup. Ct. Rep. 492.

The contention of respondents that the injunction was void, in that it abridged the right of free speech and the freedom of the press, was held to be unfounded by this court, which holding was approved by the Supreme Court of the United States. 33 App. D. C. 516, 221 U. S. 418. It, therefore, was incumbent upon respondents to obey the injunction, until vacated or modified by proper authority, and until such order of vacation or modification should become effective.

Respondents were not restrained alone from continuing the boycott, but they were forbidden to print, issue, publish, or distribute, through the mails or otherwise, any written or printed document whatever containing any reference to the Buck's Stove & Range Company's business or its product as on the "We Don't Patronize" or "Unfair" list, or to make any reference to its business or product in connection with those terms, or to make any statement orally or in writing calling attention to the fact that a boycott had been waged against its business or its product, or that it had been declared to be unfair, or that its product should not be purchased, dealt in, or handled by any dealer, tradesman, or other person whomsoever, or by the public, or to make any representation or statement for the purpose of interfering with the business of the Buck's Stove & Range Company, or with the free and unrestricted sale of its product, or of coercing or inducing any dealer, firm, or corporation or the public not to purchase, use, buy, trade in, deal in, or have in possession, any of its products.

To establish the guilt of respondents, it is not even necessary to invoke the familiar rule that every person is presumed to intend the natural and necessary consequences of his own acts. While the reports, editorials, and speeches published and circulated broadcast could have been intended only to accomplish the result of preventing the members of the American Federation of Labor and their friends, dealers, and the public generally, from purchasing or dealing in the products of the Buck's Stove

& Range Company, the utterances in themselves, regardless of their effect, constituted a violation of the express terms of the court's decree. That respondents did not intend to respect the order of the court is apparent from the following extract from the report of Gompers made to the Norfolk Convention, which occurred between the date of the filing of the bill and the making of the temporary order; and which was published and circulated after the order became effective: "Recently one of the branches of the Federal courts decided by a majority vote that the boycott is illegal. * * * We should demand the change of any law which curbs the privilege and the right of the workers to exercise their normal and natural preferences. In the meantime, we should proceed as we have of old, and, wherever a court shall issue an injunction restraining any of our fellow workers from placing a concern hostile to labor's interest and themselves on our 'Unfair' list, and enjoining the workers from issuing notices of this character, the further suggestion is made that upon any letter or circular issued upon a matter of this character, after stating the name of the unfair firm and the grievance complained of, the words, 'We have been enjoined by the courts from boycotting this concern'; could be added with advantage."

That the terms of the injunction were well understood appears from the editorial of Gompers published and circulated shortly after the decree was entered, wherein he stated: "This injunction enjoined them as officers or as individuals, from any reference whatsoever to the Buck's Stove & Range Company's relations to organized labor, to the fact that the said company is regarded as unfair; that it is on an 'Unfair' list, or on the 'We Don't Patronize' list, of the American Federation of Labor. The injunction orders that the facts in controversy between the Buck's Stove & Range Company and organized labor must not be referred to, either by printed word or orally. The American Federation of Labor and its officers are each and severally named in the injunction. * * * With all due respect to the court, it is impossible for us to see how we can comply with all the terms of this injunction. We would not

be performing our duty to labor and to the public without discussion of this injunction. * * * The publication of the Buck's Stove & Range Company on the 'We Don't Patronize' list of the American Federation of Labor is the exercise of a plain right. To enjoin its publication is to invade and deny the freedom of the press,—a right which is granted under our Constitution. * * * The members of organized labor are not themselves obliged to refrain from dealing with the firms on the 'We Don't Patronize' list of the American Federation of Labor. The information is given them. There is no compulsion. They are entirely free to use their own judgment." This editorial was published and sent out with the "Urgent Appeal," which was issued by the joint action of all the respondents. It, therefore, may be regarded as their expression, for which they are each to be held responsible.

It must be remembered that we are here dealing with a conspiracy which was formed for the purpose of compelling the Buck's Stove & Range Company to accept labor's terms, or submit to the destruction of its business. The two million members of the American Federation of Labor and their friends were enlisted in this cause. The leaders, through their official organs, had signals which were well understood by everyone connected with the organization. As this court said in the injunction case (33 App. D. C. 83, 32 L.R.A.(N.S.) 748), referring to the "We Don't Patronize" or "Unfair" list: "The court below found, and in that finding we concur, that this list in this case constitutes a talismanic symbol indicating to the membership of the Federation that a boycott is on and should be observed." In the former case (33 App. D. C. 573) we said: "The mere mention of complainant's name by these leaders in the columns of the Federationist or on the public platform, in connection with the expressions 'boycott,' 'unfair,' or 'we don't patronize,' might tend to influence many to disregard the decree of the court, and thus become as effective notice to their followers as it had formerly been when published in the 'Unfair' or 'We Don't Patronize' list." A similar comment appears in the opinion of the Supreme Court (221 U. S. 439) as follows:

"In the case of an unlawful conspiracy, the agreement to act when the signal is published gives the words 'unfair,' 'we don't patronize,' or similar expressions, a force not inhering in the words themselves, and therefore exceeding any possible right of speech which a single individual might have. Under such circumstances they become what have been called 'verbal acts,' and as much subject to injunction as the use of any other force whereby property is unlawfully damaged. When the facts in such cases warrant it, a court having jurisdiction of the parties and subject-matter has power to grant an injunction."

The only way to enjoin a boycott of this sort is to prohibit the utterance and publication of the signals, as was done in this case. But, as disclosed by this record, the campaign never ceased. While the name of the Buck's Stove & Range Company was taken from the "We Don't Patronize" or "Unfair" list, the fact that it was still to be treated as on the list was heralded through the Federationist and other mediums. It was unnecessary to prove that the boycott continued after the injunction became effective. If it did not, it was not the fault of respondents. They furnished the material to keep the machinery in operation, and therein was the contempt. The result might be presumed, if essential to the determination of the question before us.

In Mitchell's Case, by his own admission made one year after the commission of the act, he was a direct participant in continuing the boycott. Referring in the former opinion (33 App. D. C. 574) to his presiding over the annual convention of the United Mine Workers, when the resolution set out in the report was adopted, the court said: "The adoption of this resolution could accomplish but one end,—the perpetuation and continuation of the boycott. A labor organization can conduct an unlawful boycott as effectually by compelling its own members to refrain from dealing with the party boycotted, as by coercing others into similar action."

Error is assigned "in receiving improper testimony over the objection of the respondents, as shown by the bill of exceptions herein," and "in excluding proper testimony offered on behalf

of the respondents, as shown by the bill of exceptions herein."
Whether objectionable testimony was admitted is not before us
upon specific assignments of error. The judgment finding re-
spondents guilty of contempt is general, unaccompanied by any
finding of fact; hence, it is unnecessary to examine each partic-
ular charge, if it appears that in each case there is sufficient
proof to support the judgment. *Claassen* v. *United States,* 142
U. S. 140, 35 L. ed. 966, 12 Sup. Ct. Rep. 169. The case
having been tried to the court, it will be presumed that only
competent evidence was considered in making up the judg-
ments, and of such the record discloses sufficient to support the
judgment of guilt in each instance. Besides, the trial court
is the proper tribunal to determine the weight of the evidence.
So far as objections and exceptions to the admission or rejection
of evidence appear, the record discloses loose practice. If, how-
ever, any objections were so preserved as to be available for
review in this court, respondents, in the absence of specific as-
signments of error, will be deemed to have waived them. The
assignments of error touching this matter are so indefinite that
counsel did not seem to consider them of sufficient importance
to call for argument at bar. They may be presumed, therefore,
to have been abandoned.

The assignments relating to the bar of the statute of limita-
tions will now be considered. The charge is for criminal con-
tempt. *Gompers* v. *Buck's Stove & Range Co.* 33 App. D. C.
516, 221 U. S. 418, 55 L. ed. 797, 34 L.R.A.(N.S.) 874, 31
Sup. Ct. Rep. 492. The question at once arises whether crim-
inal contempt is a crime within sec. 1044 of the Revised Stat-
utes of the United States, U. S. Comp. Stat. 1901, p. 725, which
provides: "No person shall be prosecuted, tried, or punished
for any offense not capital, except as provided in section one
thousand and forty-six, unless the indictment is found, or the
information is instituted, within three years next after such
offense shall have been committed."

Does the report of the committee in this case rise to the dig-
nity of a criminal information? If it does not, it cannot be
embraced within the statute of limitations. At common law,

informations were of two kinds,—those filed *ex officio* by the attorney general, and those prosecuted by leave of court in the name of the coroner or master of the Crown office. 1 Chitty, Crim. Law, 843. The abuse in the star chamber originated out of the latter class, which have never existed in this country. 1 Bishop, Crim. Pro. § 143. Criminal informations in this country are the same as were presented in England by the attorney general, or, in his absence, by the solicitor general. They differ from indictments only in being presented by the attorney general in England, or the district attorney in this country, instead of by a grand jury. In *Goddard* v. *State,* 12 Conn. 448, where a complaint had been filed by a tithingman with a justice of the peace, charging a breach of the Sabbath, and the accused was convicted without a jury, as demanded by him, the court, in holding that the complaint was not a criminal information within the Bill of Rights, said: "If, then, the words 'indictment' or 'information' have a well-known meaning at the common law, we are to inquire not merely whether this complaint is not much like an information, but whether it is the information of the common law. An information differs from an indictment in little more than the source from which it comes. And a complaint by a tithingman or grand juror may, in its form, differ but little from the information of the attorney general or the master of the Crown office. But this fact will no more prove that it is an information, than that the information of the attorney is an indictment. * * * It has been attempted, by the counsel of the plaintiff in error, to show that in its form and nature it partakes of the features of an information. And it is certainly true that every accusation of one person by another to a magistrate is information to that magistrate. But it is not therefore the information spoken of in the Constitution, because it does not come from the source which gives it that character."

We think there is a well-defined distinction between a complaint and an information. A complaint may be made by a private person against an alleged offender, and may be used by the proper prosecuting officer as the basis for the filing of an

information, or for presenting an indictment to the grand jury. The information referred to in the statute of limitations is what is understood as a criminal information, and, in law, such an information can only originate from the officer charged with the prosecution of crime within the jurisdiction. The report of the committee in the present case meets none of the requirements of an information. It was only intended to present a state of facts to the court upon which it might proceed, is so advised. In contempt, the contemner is brought into court by citation, and the proceeding then is most informal, and in total disregard of many of the essential elements of criminal pleading. In the case of *Re Savin,* 131 U. S. 267, 33 L. ed. 150, 9 Sup. Ct. Rep. 699, the charge of contempt was orally reported to the court, and written specifications, although demanded by the accused, were denied. On the subject of procedure in contempt, the court said: "It is, however, contended that the proceedings in the district court were insufficient to give that court jurisdiction to render judgment. This contention is based merely upon the refusal of the court to require service of interrogatories upon the appellant, so that, in answering them, he could purge himself of the contempt charged. The court could have adopted that mode of trying the question of contempt, but it was not bound to do so. It could, in its discretion, adopt such mode of determining that question as it deemed proper, provided due regard was had to the essential rules that obtain in the trial of matters of contempt." What may be said of the procedure in contempt applies equally to disbarment and other matters within the inherent jurisdiction of the court. *Randall* v. *Brigham,* 7 Wall. 523, 19 L. ed. 285. In the present case, the court issued citations, and the charges contained in the report were made the basis upon which respondents were tried. But while sufficient for contempt, it will not be contended that such a document could be distorted into a criminal information upon which a defendant could be prosecuted for a crime. "A proceeding for contempt is not a criminal case in the sense that all the provisions of our statutes in regard to criminal practice

and procedure are applicable to it." *Hurley* v. *Com.* 188 Mass. 443, 74 N. E. 677, 3 Ann. Cas. 757. .

Contempt of court is not a statutory crime in this country. The Federal courts have jurisdiction only of such offenses as by statute are declared to be crimes. No jurisdiction exists over purely common-law offenses. *United States* v. *Britton,* 108 U. S. 199, 27 L. ed. 698, 2 Sup. Ct. Rep. 531; *United States* v. *Hudson,* 7 Cranch, 32, 3 L. ed. 259; *United States* v. *Coolidge,* 1 Wheat. 415, 4 L. ed. 124; *United States* v. *Eaton,* 144 U. S. 677, 36 L. ed. 591, 12 Sup. Ct. Rep. 764. In *Manchester* v. *Massachusetts,* 139 U. S. 240, 262, 35 L. ed. 159, 166, 11 Sup. Ct. Rep. 559, the court said: "The courts of the United States, merely by virtue of this grant of judicial power, and in the absence of legislation by Congress, have no criminal jurisdiction whatever. The criminal · jurisdiction of the courts of the United States is wholly derived from the statutes of the United States."

In the decisions, the courts have expressed a variety of views as to the nature of the action for the punishment of contempts. Some have held it to be a criminal proceeding, in that a penalty is attached; some have held it to be in the nature of a criminal proceeding. Penalty and punishment are not alone sufficient to distinguish the proceeding as criminal. The action is *sui generis,* in a class by itself, partaking of some of the elements of both civil and criminal proceedings, but, strictly speaking, it is neither. It belongs to a class of proceedings inherent in the court, and deemed essential to its existence. It would hardly be held that a disbarment proceeding is criminal, although a severe penalty may be imposed; or that the power of a court to reprimand its officers for misconduct is a criminal proceeding, though the penalty imposed is humiliating and severe. These belong to a class of proceedings essential to the self-preservation of a court, and inherent in all courts, irrespective of their constitutional and statutory jurisdiction. Contempt, therefore, is without any particular form of action, and not subject to the limitations of procedure prescribed for the conduct of either civil or criminal actions. While Congress has the power to

declare an act in contempt of court a crime, it has never exercised this power. The power of the Federal courts to commit and punish for contempt is inherent in the court where the contempt occurs. *Ex parte Terry,* 128 U. S. 289, 32 L. ed. 405, 9 Sup. Ct. Rep. 77. As was said in *Watson* v. *Williams,* 36 Miss. 331: "The power to fine and imprison for contempt, from the earliest history of jurisprudence, has been regarded as a necessary incident and attribute of a court, without which it could no more exist than without a judge. It is a power inherent in all courts of record, and coexisting with them by the wise provisions of the common law." This statement of the law is quoted with approval in *Re Debs,* 158 U. S. 564, 39 L. ed. 1092, 15 Sup. Ct. Rep. 900. It is idle to assert that the power to punish for contempt of court is inherited from the common law. The power was inherent in the courts of the United States from their creation, and exists by virtue of their creation. It is not dependent upon precedent, origin, or custom, but would exist if this power had never been exercised by the courts of England. Section 725, Rev. Stat. U. S. Comp. Stat. 1901, p. 583, merely limits the inherent power of all courts of the United States to punish acts in contempt of their authority, and prescribes the punishment that may be inflicted. *Pierce* v. *United States,* 37 App. D. C. 582; *Anderson* v. *Dunn,* 6 Wheat. 204, 5 L. ed. 242; *Ex parte Robinson,* 19 Wall. 505, 22 L. ed. 205; *Eilenbecker* v. *District Ct.* 134 U. S. 31, 33 L. ed. 801, 10 Sup. Ct. Rep. 424.

All crimes punishable under Federal jurisdiction being statutory, it is important to consider what is embraced within the accepted use of the term "crime." It is not important that criminal contempts in isolated instances may have been tried by jury upon indictment and information prior to the time of Henry V. They have never been so tried in this country. The important question before us is whether, under the procedure adopted and followed in the Federal courts, contempts are within the classification of crimes as treated in the Constitution, statutes, and decisions of the courts. Article III. of the Constitution of the United States provides that "the trial of all

crimes, except in cases of impeachment, shall be by jury." The
5th and 6th Amendments to the Constitution provide, among
other things, that "no person shall be held to answer for a capi-
tal or otherwise infamous crime, unless on a presentment or in-
dictment of a grand jury;   *   *   *   nor shall any person be
subject for the same offense to be twice put in jeopardy of life
or limb." "In all criminal prosecutions, the accused shall en-
joy the right to a speedy and public trial by an impartial jury,"
and "to be confronted with the witnesses against him."

The statute of limitations was part of the original judiciary
act, passed contemporaneously with the adoption of the Bill of
Rights, of which the above Amendments are a part. That Con-
gress had in mind the class of crimes referred to in the Consti-
tution is apparent, in that the statute is limited to crimes prose-
cuted upon indictment or information, and can only be con-
strued to relate to offenses within the criminal jurisdiction of
the Federal courts. Inasmuch, therefore, as the statute of limi-
tations relates only to statutory crimes within the jurisdiction
of the Federal courts, it is not important that the courts of the
District of Columbia are vested with common-law jurisdiction
(Code D. C. sec. 1, [31 Stat. at L. 1189, chap. 854]), since
common-law crimes are not embraced within the statute. If
contempts are embraced within the classification of crimes in-
cluded in the statute of limitations, equity, circuit, and probate
courts, courts of appeal, and the Supreme Court of the United
States are without original jurisdiction to punish for contempt,
since the sole jurisdiction over criminal offenses· is confined to
the inferior courts of the United States expressly vested with
criminal jurisdiction. *Middlebrook* v. *State,* 43 Conn. 257, 21
Am. Rep. 650, where a criminal contempt had been tried and
judgment imposed in the court of common pleas, a court without
criminal jurisdiction, the court said: "This is not a criminal
proceeding within the meaning of the statute. The fine and
imprisonment which the court is authorized to inflict for a con-
tempt are not intended as a punishment for a crime committed
in violation of the criminal law; and punishment for the con-
tempt is no bar to a prosecution for a breach of the peace, not-

withstanding the universal maxim that no one shall be put in jeopardy twice for the same offense. Courts of chancery and probate courts have no criminal jurisdiction, and yet it will hardly be denied that they have power to punish for contempt." In Michigan it has been held that "proceedings for contempt are not criminal causes within the intent and meaning of the Constitution of the United States or of this State." *Re Chadwick*, 109 Mich. 588, 67 N. E. 1071.

In *Merchant's Stock & Grain Co.* v. *Board of Trade*, 201 Fed. 20, is found the following admirable distinction between the procedure in criminal prosecutions and in contempt cases: "It is to be noted: First. That criminal contempts are tried summarily, and not in the regular course or way. Second. That there is no right of trial by jury. *Eilenbecker* v. *District Ct.* 134 U. S. 31, 33 L. ed. 801, 10 Sup. Ct. Rep. 424; *Interstate Commerce Commission* v. *Brimson*, 154 U. S. 447, 38 L. ed. 1047, 4 Inters. Com. Rep. 545, 4 Sup. Ct. Rep. 1125; *Re Debs*, 158 U. S. 564, 39 L. ed. 1092, 15 Sup. Ct. Rep. 900; *King* v. *Ohio & M. R. Co.* 7 Biss. 529, Fed. Cas. No. 7,800. Third. Courts of chancery and other courts without criminal jurisdiction can punish for so-called criminal contempt. *Middlebrook* v. *State,* 43 Conn. 257, 21 Am. Rep. 650; *Cartwright's Case,* 114 Mass. 230; Rapalje, Contempt, sec. 3. Fourth. As there is no power in any except the court against which the contempt is committed to punish it, that is, as such court has exclusive jurisdiction, no change of venue can be allowed. Rapalje, Contempt, § 13. Fifth. For a criminal actual contempt a defendant may, without a waiver and without his consent, be sentenced in his absence. *Ex parte Terry,* 128 U. S. 289, 32 L. ed. 405, 9 Sup. Ct. Rep. 77; *Middlebrook* v. *State,* 43 Conn. 257, 21 Am. Rep. 650. Sixth. An act which is a contempt of court and also a crime may be punished both by the summary provision and by indictment, and neither will bar the other. Bishop, New Crim. Law, sec. 1067; *Chicago Directory Co.* v. *United States Directory Co.* 123 Fed. 194; *O'Neil* v. *People,* 113 Ill. App. 195. In other words, the constitutional provision protecting him against being twice put in jeopardy does not protect him

from being punished for contempt and under indictment for the same act." For example, had respondents been indicted and tried, as might have been done, under sec. 5399, U. S. Rev. Stat. U. S. Comp. Stat. 1901, p. 3656 (*Petlibone* v. *United States,* 148 U. S. 197, 37 L. ed. 419, 13 Sup. Ct. Rep. 542) it would have been no bar to the present proceeding. This distinction eliminates all possibility of dispute as to the classification of contempt of court. If treated as a crime, it would be controlled by the jeopardy and other clauses of the Constitution. In view of the state of the law, it is not surprising that contempt proceedings have been characterized as *sui generis*. *O'Neal* v. *United States,* 190 U. S. 36, 47 L. ed. 945, 23 Sup. Ct. Rep. 776, 14 Am. Crim. Rep. 303; *Bessette* v. *W. B. Conkey Co.* 194 U. S. 324, 48 L. ed. 997, 24 Sup. Ct. Rep. 665.

Thus, it will be observed that, in the exercise of this inherent power, the prosecution for contempt of court is not confined to the criminal courts, and many of the essential guaranties of the Constitution relating to the trial and punishment of crimes are totally disregarded.

It may well be that, owing to the peculiar character of proceedings to punish for contempt of court, technically neither in equity nor at law, unreasonable delay in instituting proceedings after the commission of the acts complained of would constitute laches, and justify appellate interference. That condition, however, does not arise in this case. Respondents were originally proceeded against without delay. The appeal was promptly heard in this court, and advanced for hearing in the supreme court. When the judgment was there reversed and remanded for such further proceedings as might seem advisable, the court proceeded with extreme promptness to institute the present action. Hence, there is nothing in this case to justify us in invoking the rule of laches, or to call for an expression of opinion as to our jurisdiction in the premises.

It appears that when the former case was certified back to the supreme court of the District of Columbia for dismissal, Mr. Justice Gould was presiding in that division of the equity court where the decree in the original injunction suit, Equity No.

27,305, was entered. Instead of instituting this proceeding, he certified the matter over to Mr. Justice Wright, who was presiding in the other equity division of the court, where these proceedings were begun and captioned Equity No. 30,180. This course of proceeding is assigned as error. The supreme court of the District of Columbia is a single court of general jurisdiction with six judges. The mere fact that the various jurisdictions are by rule divided and assigned to different judges does not in any way affect the general jurisdiction of the court. The action here is for the violation of the terms of an order of injunction issued by the supreme court of the District of Columbia, and the mere fact that this proceeding was instituted in a different equity division, as composed by the rules of the court, than that in which the injunction proceeding originally existed, is unimportant. They both originated in the equity branch of the court. Where the contempt is for violation of an order of a court of equity, it is proper that the contempt be prosecuted by that court. *Bessette* v. *W. B. Conkey Co.* 194 U. S. 324, 48 L. ed. 997, 24 Sup. Ct. Rep. 665. The contempt proceeding may be in the title of the original case. *Ibid.* Or it may be in the name of the United States. *O'Neal* v. *United States,* 190 U. S. 36, 47 L. ed. 945, 23 Sup. Ct. Rep. 776, 14 Am. Crim. Rep. 303. Or it may be on the relation of the party cited. *Re Debs,* 158 U. S. 564, 39 L. ed. 1092, 15 Sup. Ct. Rep. 900. Or it may be purely an *ex parte* proceeding. *Ex parte Fisk,* 113 U. S. 713, 28 L. ed. 1117, 5 Sup. Ct. Rep. 724. As was said in *Bessette* v. *W. B. Conkey Co.* supra. "A contempt proceeding is *sui generis.* * * * It may be resorted to in civil as well as criminal actions, and also independently of any civil or criminal action."

Contempt of court may be prosecuted by a committee of the bar appointed by the court for that purpose, or by the proper prosecuting officer of the jurisdiction, or by both. No particular form of complaint is necessary. A criminal contempt may be brought to the attention of the court by verified petition in the name of the parties to the original suit, and prosecuted at the instance of the injured party by his attorneys. *Bessette* v.

*W. B. Conkey Co.* supra. Formal charges as in criminal cases are unnecessary in contempt proceedings. All that is necessary to their validity is that the alleged contemner shall have notice of the charges and an opportunity afforded him to make his defense. In *Re Savin,* 131 U. S. 267, 33 L. ed. 150, 9 Sup. Ct. Rep. 699, the court, discussing the analogy between contempt and disbarment proceedings, quoted with approval from *Randall* v. *Brigham,* 7 Wall. 523, 540, 19 L. ed. 285, 293, as follows: "It is not necessary that proceedings against attorneys for malpractice, or any unprofessional conduct, should be founded upon formal allegations against them. Such proceedings are often instituted upon information developed in the progress of a cause; or from what the court learns of the conduct of the attorney from its own observation. Sometimes they are moved by third parties upon affidavit; and sometimes they are taken by the court on its own motion. All that is requisite to their validity is that, when not taken for matters occurring in open court, in the presence of the judges, notice should be given to the attorney of the charges made, and opportunity afforded him for explanation and defense."

Error is urged in the appointment of a United States Commissioner for the purpose of taking testimony in this cause. The custom of taking testimony by deposition, affidavit, or interrogatories in contempt cases is ancient. 1 Newland's Ch. Pr. 392. The practice has prevailed generally in this country. Rapalje, Contempt, 124; Fletcher, Eq. Pl. & Pr. sec. 553; *Una* v. *Dodd,* 38 N. J. Eq. 460. It was the method adopted by the Supreme Court in the recent case of *United States* v. *Shipp,* 203 U. S. 563, 51 L. ed. 319, 27 Sup. Ct. Rep. 165, 8 Ann. Cas. 265, 214 U. S. 386, 53 L. ed. 1041, 29 Sup. Ct. Rep. 637. See also *Re Savin,* 131 U. S. 267, 278, 33 L. ed. 150, 153, 9 Sup. Ct. Rep. 699; *Re Chiles (Texas* v. *White),* 22 Wall. 157, 22 L. ed. 819. The question, however, does not arise in this case, since all testimony was taken in open court.

The committee in its report inserted the following suggestion: "With regard to each and every of the acts, statements, and publications above set forth, the said Samuel Gompers as-

serted, and it may be he then believed, that the injunction was not binding upon him because of what he claimed to be his constitutional right of free speech and a free press; and it may be that, now that this contention upon his part has been determined by the Supreme Court of the United States to be unfounded, he may be prepared to make such due acknowledgment, apology, and assurance of future submission to the court as may sufficiently answer the necessary purpose of vindicating its authority, and that of the law. Should such acknowledgment, apology, and submission not be forthcoming, after due notice and opportunity, the course necessary to be pursued to maintain its dignity, and due respect for and obedience to the law, is respectfully submitted to the court for its consideration." The same suggestion was made in the report to both Mitchell and Morrison. It appears that the court stood ready up to the time of pronouncing judgment, to accept a compliance with the terms of the suggestion as purging respondents of contempt and a justification for their discharge. They, however, refused to adopt the suggestion offered.

This is important in measuring the intent and temper of respondents. In the former proceedings, they attempted to justify upon the ground that the order of injunction was an abridgment of the right of free speech and a free press. Three courts, culminating with the Supreme Court of the United States, had held against them, and the only question submitted by this suggestion was whether they were now ready to submit to the law of the land as interpreted by its highest tribunal. Standing convicted of a most persistent and flagrant violation of an order of a court of the United States, after every excuse for their action had been brushed away, they not only refused submission to the courts, but, by their action, contemptuously defied all lawful and constitutional authority;—yea, government itself.

The mere fact that respondents are charged with the disobedience of an order of injunction is unimportant compared with the larger question involved in this case. We are confronted with a deep-laid conspiracy to trample under foot the law of

the land, and set in defiance the authority of the government. The prominence of the respondents only adds to the gravity of the offense. Their wide influence and power thus exerted reaches not only to every subordinate branch of the great organization of which they are the leaders, but to its friends and sympathizers. If law is to be supreme; if the authority of the government is to be maintained, it is not for the courts to treat lightly a conspiracy for their destruction, either because of the prominence and influence of the conspirators, or in deference to the inspired clamor of their misguided followers. Mercy follows justice. It is not a time for appellate tribunals to indulge in finespun theories of practice or procedure for the purpose of finding a plausible excuse for discharging those, however prominent, who have offended against the authority of law and government. If men of high position may defy the authority of the constitutionally ordained tribunals of the government, and escape through a loose administration of justice, what can be said of their followers? Inspired by the success of their leaders, they will become imbued with a more vicious spirit, because less restrained by the refinements of education and the associations surrounding powerful leadership.

But it is urged that the punishment imposed is unusual and excessive. With this contention we agree. But has this court power to modify the judgment? In *Ballew* v. *United States,* 160 U. S. 187, 40 L. ed. 388, 16 Sup. Ct. Rep. 263, the court held that where there was a verdict of guilty on two counts, only the second being good, and "as the only errors found in the record relate to and affect the crime covered by the first count, substantial justice requires, and it is so ordered, that the general judgment rendered by the court below should be reversed, and the cause be remanded to that court with instructions to enter judgment on the second count of the indictment, and for such proceedings with reference to the first count as may be in conformity to law."

This decision contains a full review of the statutes conferring appellate jurisdiction upon the Federal courts. Section 24 of the original judiciary act, 1 Stat. at L. 85, provides: "That

when a judgment or decree shall be reversed in a circuit court, such court shall proceed to render such judgment or pass such decree as the district court should have rendered or passed, and the supreme court shall do the same on reversals therein, except where the reversal is in favor of the plaintiff or petitioner in the original suit, and the damage to be assessed, or matter to be decreed, are uncertain, in which case they shall remand the cause for a final decision."

Nor is this power of the appellate tribunals in review upon error limited to civil cases. Section 701, Rev. Stat. provides: "The supreme court may affirm, modify, or reverse any judgment, decree, or order of a circuit court or district court acting as a circuit court, or of a district court in prize causes lawfully brought before it for review, or may direct such judgment, decree, or order to be rendered, or such further proceedings to be had by the inferior court, as the justice of the case may require." The power thus conferred upon the supreme court to modify a judgment on error is almost identical in language with the power conferred on this court by the organic act (D. C. Code, sec. 226 [31 Stat. at L. 1225, chap. 854]), which provides: "Any party aggrieved by any final order, judgment, or decree of the supreme court of the District of Columbia or any justice thereof * * * may appeal therefrom to the said court of appeals, and upon such appeal the court of appeals shall review such order, judgment or decree, and affirm, reverse, or modify the same as shall be just."

Section 11 of the act of March 3, 1891 (26 Stat. at L. 826, chap. 517), creating the circuit courts of appeal, provides as follows: "And all provisions of law now in force regulating the methods and systems of review through appeals or writs of error shall regulate the method and system of appeals and writs of error provided for in this action in respect of the circuit courts of appeals, including all provisions for bonds and other securities to be required and taken on such appeals and writs of error."

Referring to these statutes, the court in the *Ballew Case* said: "It thus conclusively appears that the authority of this court to reverse and remand with directions to render such

proper judgment as the case might require, upon writs of error in criminal cases to state courts, and to circuit courts in capital cases, was confessedly conferred by express statutory provisions, and that a like power was conferred upon the circuit courts of appeals and circuit courts in cases where they exercised jurisdiction by error in criminal cases over the district courts. From this and from a review of the legislation on the subject on the powers conferred upon this court as a reviewing court, it follows, as a necessary conclusion, that general authority was given to it on writ of error to take such action as the ends of justice, not only in civil, but in criminal cases, might require."

Thus, it would seem that in this country, as in England since the act of 11 and 12 Vict. chap. 78, sec. 5, appellate courts in review on error, where the error exists solely in the judgment of the court, are vested with power to reverse the judgment and remand the case for a proper judgment. In *Middlebrook* v. *State,* supra, where the court in a contempt case exceeded its power in imposing costs in addition to fine and imprisonment, the supreme court of the State reversed that portion of the judgment relating to costs, and affirmed the judgment in respect of the fine and imprisonment. It is, however, unnecessary in the present case to decide whether this power extends to a judgment in a civil case or a statutory crime, since we are here considering the summary proceeding for contempt of court, where not only the form of proceeding largely, but the punishment entirely, is left to the discretion of the offended court. Where the only error in such a case consists in the imposition of excessive punishment, the error amounts simply to an abuse of discretion.

While the power to punish for contempt of court is vested in the court against whose dignity and authority the offense has been committed, and without which power a court would be unable long to exist, yet this discretion may be abused. If a court, for instance, should impose life imprisonment as a penalty for a contempt of its authority, it would constitute such an abuse of discretion as would amount to the exercise of mere ar-

bitrary power. So, a court may exercise arbitrary power in imposing an excessive fine or limited term of imprisonment. Arbitrary power exists nowhere in our system of government. The authority to restrain its exercise, without doing violence to the enforcement of the law, or without permitting the guilty to escape just punishment, must exist somewhere.

In our former opinion (33 App. D. C. 577) it was intimated that this court is without power to modify a judgment on appeal. This point was not there urged or regarded as essential to the disposition of the appeal. Hence, the broad statement must be accepted as an expression of opinion relative to our appellate jurisdiction over judgments in general, and without application to an exceptional case like the present, where the erroneous judgment was rendered in the exercise of judicial discretion, and where, from the record, without assuming the prerogatives of the trial court, we can direct a modification of the judgment.

In *Billings* v. *Field,* 36 App. D. C. 16, this court, considering its power to review discretionary acts of the lower court, said: "But, it is insisted, the discretion exercised by the trial court is not reviewable, and therefore its judgment will not be disturbed by an appellate tribunal except for errors in the determination of the questions arising upon the record. This court, in sec. 7 of the act of its creation (27 Stat. at L. 434, chap. 74), was expressly given jurisdiction to 'affirm, reverse, or modify,' on appeal any final order, judgment, or decree of the supreme court of the District. This provision surely clothes this court with authority to inquire whether the trial court has exercised its discretion in accordance with established rules and precedents governing the exercise of such discretion."

This court has held, in a criminal contempt, that the review on appeal must be as at common law upon writ of error. This, however, relates only to the procedure essential to bring up for review the errors relied upon for a reversal of the judgment. While in a proper case our jurisdiction is confined to reviewing alleged errors of law, the limitation does not apply where it appears on the face of the judgment that there has been an

abuse of discretion. This is unlike an ordinary criminal pro-
ceeding, where the maximum and minimum penalties are fixed
by statute, and the court, in pronouncing judgment, must keep
within those limits; nor can it be compared to a civil action
where the judgment is controlled by the verdict of a jury. In
a proceeding for punishment for contempt of court, the case is
tried in a summary manner by the court offended against with-
out the aid of a jury, or limitation as to the penalty that may
be imposed. It is even doubtful if the pardoning power has
jurisdiction to intervene. We think, therefore, that in con-
tempt proceedings where the exercise of unlimited discretion is
vested in the lower court, an abuse of that power is a proper
matter for appellate revision. An abuse of discretion, however,
when the abuse consists alone in the imposition of excessive
punishment, does not constitute such reversible error as to jus-
tify the court in directing a new trial, or the dismissal of the
action and discharge of the accused. In the absence of revers-
ible eror in the trial, as in this case, it would be doing a use-
less thing to order a new trial, when it is within the power of
the appellate tribunal to fix a reasonable punishment, and ac-
cordingly direct a modification of the judgment.

The penalty imposed for contempt of court does not partake
of many of the elements included in punishment for crime. It
is imposed in many instances for offenses which are neither
*mala in se* nor *mala prohibita,* but purely for the protection of
the dignity and authority of the court. "In brief, a court, en-
forcing obedience to its orders by proceedings for contempt, is
not executing the criminal laws of the land, but only securing
to suitors the rights which it has adjudged them entitled to."
*Re Debs,* 158 U. S. 564, 596, 39 L. ed. 1092, 1094, 15 Sup.
Ct. Rep. 900. Hence, the elements to be considered by legisla-
tures in establishing punishment for specific crimes, namely,
the reformation, if possible, of the criminal, the protection of
society, and the deterring of others from the commission of
crime, are not necessarily to be taken into account in fixing the
penalty for contempt. Contempt proceedings are not to be sub-
stituted for proceedings for the punishment of crime, but may

be resorted to only when essential to enforce the power of a court whose authority has been defied.

The distinction is well stated by Judge Taft in *Thomas* v. *Cincinnati, N. O. & T. P. R. Co.* 62 Fed. 803, as follows: "It is only to secure a present and future compliance with its orders that the power is given, and not to impose punishment commensurate with crimes or misdemeanors committed in the course of the contempt, which are cognizable in a different tribunal, or in this court by indictment and trial by jury. I have no right, and do not wish, to punish the contemner for the havoc which he and his associates have wrought to the business of this country, and the injuries they have done to labor and capital alike, or for the privations and sufferings to which they have subjected innocent people, even if they may not be amenable to the criminal laws therefor. I can only inflict a penalty which may have some effect to secure future compliance with the orders of this court, and to prevent wilful and unlawful obstructions thereof."

The rule in imposing penalties for contempt is well established by centuries of practice. In this country, the courts have seldom resorted to the imposition of penalties as severe as those imposed in this case. In the *Debs Case*, a conspiracy to boycott the Pullman Palace Car Company by threatening to call a strike among the employees of any railroad company hauling Pullman cars was enjoined, and the order was being violated by preventing railway trains from operating into and out of the city of Chicago, thus obstructing the movement of the mails, as well as commerce generally. The property of many railroad companies was being destroyed, and life placed in jeopardy. The sentences imposed for contempt ranged from three to six months in jail. In the *Thomas Case* for similar conduct a sentence of six months' imprisonment was imposed. In the case of *United States* v. *Shipp*, supra, where it was found that a sheriff and his deputies had abetted a mob in lynching a prisoner, the Supreme Court imposed a penalty of three months' imprisonment. These are extreme penalties. In the States, lighter penalties are imposed for similar offenses. In most

cases, for the mere violation of an order of injunction, where
private parties are involved, fines are imposed.   From these
and similar cases, a rule of practice has been established in this
country which should govern courts in imposing penalties for
contempt.   However, to permit respondents to escape punish-
ment would be a travesty upon justice, but we think that, in-
asmuch as the extreme punishment that could be imposed
against respondents in a criminal prosecution under sec. 5399,
supra, would be limited to a fine of $500 or imprisonment for
three months, or both, the penalty imposed is so unreasonable
as to demand modification.

The differences which necessitated the injunction have been
settled.   The sole purpose of punishment, therefore, is to give
reasonable assurance that respondents will in the future respect
the authority of the courts.   While the injunction was issued
to restrain the most subtle and far-reaching conspiracy to boy-
cott that has come to our attention, the boycott had ceased
and the necessity for the injunction no longer existed at the
time this case was tried below.   A penalty, therefore, which
would have been justifiable to prevent further defiance of the
order of the court but for the settlement, would now be need-
less and excessive.   Had the court below imposed penalties not
greatly in excess of those which we now deem adequate, we
would not feel justified in holding that there had been an
abuse of discretion.   Since, however, the penalties imposed
are so unreasonably excessive, and we are called upon to modify
the judgments, we prefer to err, if at all, on the side of modera-
tion.   No one, however, can read this record without being
convinced that respondent Gompers has been the chief factor
in this contempt; hence, a severer punishment is merited in
his case than in the cases of the other respondents.

Since the only error in the record relates to the excessive
punishment imposed, justice requires, and it is so ordered, that
the judgment be reversed, and the cause remanded with in-
structions to the court below to enter orders in proper form
adjudging respondents Samuel Gompers, John Mitchell, and
Frank Morrison, respectively, guilty of contempt of court, and

imposing a sentence upon Gompers of imprisonment in the Washington Asylum and Jail for the term of thirty days, and upon Mitchell and Morrison each a fine in the sum of $500, and in default of the payment of said fine, that they be confined in the Washington Asylum and Jail until paid.

*Reversed and remanded.*

Mr. Chief Justice SHEPARD dissenting:

I regret that I cannot concur in the opinion of the majority of the court, and shall state the grounds of my dissent as briefly as practicable.

The question of first importance is whether the criminal contempt charged constitutes an offense against the United States, and is therefore subject to the bar of the statute of limitations. In my opinion such a contempt does constitute an offense against the United States. It was so regarded by the Supreme Court of the United States in the earliest case upon the subject,—*Ex parte Kearney,* 7 Wheat. 38–43, 5 L. ed. 391–392. In that case a writ of habeas corpus was denied to review a conviction of criminal contempt, on the ground that it was a criminal offense. This was followed in *New Orleans* v. *New York Mail S. S. Co.* 20 Wall. 387–392, 22 L. ed. 354–357, where Mr. Justice Swayne said: "Contempt of court is a specific criminal offense. The imposition of a fine was a judgment in a criminal case." See also *O'Neal* v. *United States,* 190 U. S. 36–38, 47 L. ed. 945, 946, 23 Sup. Ct. Rep. 776, 14 Am. Crim. Rep. 303; *Bessette* v. *W. B. Conkey Co.* 194 U. S. 324–326, 48 L. ed. 997–1001, 24 Sup. Ct. Rep. 665, where Mr. Justice Brewer said: "A contempt proceeding is *sui generis.* It is criminal in its nature, in that the party is charged with doing something forbidden, and, if found guilty, is punished." See also *Worden* v. *Searls,* 121 U. S. 14–26, 30 L. ed. 853–857; *Re Muller,* 7 Blatchf. 23, Fed. Cas. No. 9,911; *Fischer* v. *Hayes,* 19 Blatchf. 13, 6 Fed. 63–64, s. c. 102 U. S. 121, 26 L. ed. 95; *United States* v. *Jacobi,* 1 Flipp. 108, Fed. Cas. No. 15,460; *Castner* v. *Pocahontas*

*Collieries Co.* 117 Fed. 184; *Bullock Electric & Mfg. Co.* v. *Weslinghouse Electric & Mfg. Co.* 63 C. C. A. 607, 129 Fed. 105–107; *S. Anargyros* v. *Anargyros Co.* 191 Fed. 208–212; *Re Schull,* 221 Mo. 623–627, 133 Am. St. Rep. 496, 121 S. W. 10; *Williamson's Case,* 26 Pa. 1–19, 67 Am. Dec. 374; *People ex rel. Blumle* v. *Neill,* 74 Ill. 68. In the following State cases criminal contempt was held to be an offense, and, as such, within the power of the executive to pardon: *Ex parte Stickney,* 4 Smedes & M. 751; *State ex rel. Van Orden* v. *Sauvinet,* 24 La. Ann. 119–122, 13 Am. Rep. 115; *Sharp* v. *State,* 102 Tenn. 10, 43 L.R.A. 788, 73 Am. St. Rep. 851, 49 S. W. 752. In *Beattie* v. *People,* 33 Ill. App. 651, it was held a misdemeanor, and, as such, subject to the general bar of the statute of limitations. In the case of *Gompers* v. *Buck's Stove & Range Co.* 221 U. S. 418–444, 55 L. ed. 797–807, 34 L.R.A.(N.S.) 874, 31 Sup. Ct. Rep. 492, certain fundamental rules of the criminal law were declared to govern as follows: "In proceedings for criminal contempt the defendant is presumed to be innocent; he must be proved to be guilty beyond a reasonable doubt, and cannot be compelled to testify against himself." In *Pierce* v. *United States,* 37 App. D. C. 582–589, this court said: "It is therefore in the nature of a criminal proceeding, and governed by the principles and procedure relating thereto, save in respect of indictment and trial by jury."

It is argued that criminal contempt is not an offense against the United States, punishable as a crime, because it is not defined in the statutes, and the courts of the United States have no jurisdiction of common-law offenses. Undoubtedly, the general principle that the United States courts have no power to entertain a criminal charge unless it be an offense defined by statute prevails; but the question is: Is there a well-defined exception to this rule that includes the present case? In the beginning in England, a contempt of the King's court was a crime punishable by information or indictment, and this applied to offenses committed in the presence of the court. This is established by the researches of Solly Flood, Q. C.,

contained in an article before the Royal Historical Society in 1885. Transactions of the Royal Historical Society N. S. vol. 3, 47–147. The object of the article was an inquiry into the foundations of the legend of the commitment of Prince Henry for contempt, by Chief Justice Gascoigne, as depicted by Shakespeare. (Second Henry IV. Act V., Scene 2.) The author was quite successful in demonstrating the want of foundation for the story. He established the fact by reciting the proceedings in the Year Books from the earliest days, that in no instance had there been a case where a criminal contempt had been punished in a summary way, or without indictment, presentment, or information, prior to the beginning of the reign of Henry the Fifth. A transcript from the Year Books is given in the publication. John Charles Fox, who took up the question later, shows that no change was made in the procedure until the star chamber assumed the power to examine and punish contempt of the several courts. This power was exercised until its abolition by act of Parliament in Sixteenth Charles I., which act recites that all matters determinable in that court may have their proper remedy and redress by the common law of the land. From this time began the summary proceeding for contempt in the common-law courts. See 24 Law Quarterly Rev. 184, April and July, 1908, Number 95, title *Rex* v. *Almon.* Prof. J. H. Beale, Jr., expresses the same opinion. He says: "Active contempt of the court, like similar contempt of the King's writs, is a crime, and may be presented by indictment, presentment, or information." 21 Harvard L. Rev. Jan. 1908, pp. 161–169.

Lord Halsbury in his Laws of England, treating of contempt says (vol 7): "604. Criminal contempt is a misdemeanor punishable by fine or imprisonment, or by order to give security for good behavior. The superior courts have an inherent jurisdiction to punish criminal contempt by the summary process of attachment or committal in cases where indictment or information is not calculated to serve the ends of justice. The power to attach and commit, being arbitrary and unlimited, is to be exercised with the greatest caution, and as the applica-

tion of this remedy invokes the withdrawal of the offense from the cognizance of a jury, it is only to be resorted to where the administration of justice would be hampered by the delay involved in pursuing the ordinary criminal process."

Again he says (vol. 9) : "998. Contempt of court is a misdemeanor at common law and punishable by fine and imprisonment without hard labor. Contempt of a court of record is also punishable summarily by committal or attachment by that court, and this is the course usually taken. But in all cases the remedy by indictment remains."

It was a necessary power to preserve the orderly administration of justice. As said by Lord Chief Justice De Grey: "It is legal because necessary." *Crosby's Case,* 3 Wils. 188; see *Ex parte Fisk,* 113 U. S. 713–718, 28 L. ed. 1117–1119, 5 Sup. Ct. Rep. 724.

In a case in the circuit court for the District of Columbia an indictment for using contemptuous language to the mayor of Alexandria in a proceeding before him as *ex officio* justice of the peace was upheld. *United States* v. *Beale,* 4 Cranch, C. C. 313, Fed. Cas. No. 14,549. That this necessary power was recognized as a part of the judicial power at the time of the adoption of the Constitution is thus stated by Mr. Justice Harlan: "The moment the courts of the United States were called into existence and invested with jurisdiction over any subject, they became possessed of this power." *Ex parte Terry,* 128 U. S. 289–305, 32 L. ed. 405–409, 9 Sup. Ct. Rep. 77. The learned justice quoted also with approval *Cartwright's Case,* 114 Mass. 230–238, where it was said this power "is inherent in courts of chancery and other superior courts, as essential to the execution of their powers and to the maintenance of their authority, and is part of the law of the land, within the meaning of Magna Charta and of the 12th Article of our Declaration of Rights." He also quoted the following from *Cooper's Case,* 32 Vt. 253–257: "The power to punish for contempt is inherent in the nature and constitution of a court. It is a power not derived from any statute, but arising from necessity; implied, because it is necessary to the exercise of all

other powers." See also *Eilenbecker* v. *District Ct.* 134 U. S. 31–37, 33 L. ed. 801–803, 10 Sup. Ct. Rep. 424. The existence of the power was expressly recognized by statute. Rev. Stat. 725, U. S. Comp. Stat. 1901, p. 583. In *Re Sabin,* 131 U. S. 267–276, 33 L. ed. 150–153, 9 Sup. Ct. Rep. 699, it was said: "Under that statute the question whether particular acts constituted a contempt, as well as the mode of proceeding against the offender, was left to be determined according to such established rules and principles of the common law as were applicable to our situation." Consistent with this view relating to the common-law power of the courts and the mode of procedure is the declaration of the supreme court in *Gompers* v. *Buck's Stove & Range Co. supra,* that while trial by jury is not permitted, certain other principles of the Bill of Rights applicable to all criminal proceedings are to be observed. It seems clear that this right of summary procedure for criminal contempt was an essential part of the judicial power when our Constitution was adopted, and passed as an incident of that power in the creation of the courts of the United States, as indicated in the cases cited above. *Ex parte Terry; Re Sabin; Eilenbecker* v. *District Ct.* For this reason the denial of the right of trial by jury is clearly within the principle enounced by Mr. Justice Brown in *Robertson* v. *Baldwin,* 165 U. S. 275–281, 41 L. ed. 715–717, 17 Sup. Ct. Rep. 326. In that case a writ of habeas corpus had been denied in the circuit court for the district of Oregon. It had been sued out by seamen of an American bark, who had been, and were, confined on board ship by order of a justice of the peace under the power conferred by an act of Congress relating to seamen. Rev. Stat. secs. 4596, 4598, and 4599, U. S. Comp. Stat. 1901, p. 3113. An appeal was taken to the Supreme Court, and the argument was that this imprisonment and compulsory service were in violation of the 13th Amendment. Mr. Justice Brown said: "The law is perfectly well settled that the first ten Amendments to the Constitution, commonly known as the Bill of Rights, were not intended to lay down any novel principles of government, but simply to embody certain guaranties and immunities

which we had inherited from our English ancestors, and which had from time immemorial been subject to certain well-recognized exceptions arising from the necessities of the case. In incorporating these principles into the fundamental law, there was no intention of disregarding the exceptions, which continued to be recognized as if they had been formally expressed. Thus, the freedom of speech and of the press (art. 1) does not permit the publication of libels, blasphemous or indecent articles, or other publications injurious to public morals or private reputations; the right of the people to keep and bear arms (art. 2) is not infringed by laws prohibiting the carrying of concealed weapons; the provision that no person shall be twice put in jeopardy (art. 5) does not permit a second trial, if, upon the first trial, the jury failed to agree, or if the verdict was set aside upon the defendant's motion. *United States* v. *Ball,* 163 U. S. 662–672, 41 L. ed. 300–303, 16 Sup. Ct. Rep. 1192. Nor does the provision of the same article that no one shall be a witness against himself impair his obligation to testify, if the prosecution against him be barred by the lapse of time, a pardon, or by statutory enactment. *Brown* v. *Walker,* 161 U. S. 591, 40 L. ed. 819, 5 Inters. Com. Rep. 369, 16 Sup. Ct. Rep. 644, and cases cited. Nor does the provision that an accused person shall be confronted with the witnesses against him prevent the admission of dying declarations, or the depositions of witnesses who have died since the former trial." *Roberlson* v. *Baldwin,* 165 U. S. 275–281, 41 L. ed. 715–717, 17 Sup. Ct. Rep. 326. See also *Dallemagne* v. *Moisan,* 197 U. S. 169–174, 49 L. ed. 709–711, 25 Sup. Ct. Rep. 422.

This review makes it plain, to me at least, why all of the courts of the United States, civil as well as criminal, have jurisdiction of this particular offense, which has not been made a crime by statute. Being a criminal contempt, that is to say, a specific criminal offense prosecuted according to the practice of the courts of common law, I am of the opinion that it comes within the spirit, if not the letter, of Rev. Stat. sec. 1044, U. S. Comp. Stat. 1901, p. 725, which reads: "No person shall be prosecuted, tried, or punished for any offense not capital,

except as provided in sec. 1046, unless the indictment is found or the information is instituted within three years next after such offense shall have been committed." The spirit of the enactment is that no one shall be punished for an offense not capital, unless the prosecution shall have been instituted within three years from its commission. The reason for requiring speedy prosecution in cases of criminal contempt are, if anything, stronger than those which apply to ordinary crimes and misdemeanors. The benefit of the punishment is largely lost by delay. The prosecution in this case was begun by the report of the committee making charges under oath, and is tantamount to an information, though not technically one. Save in the exceptional cases where the contempt is committed in the presence of the court, the defendant must be informed of the charge which he is called to answer.

In accordance with this view, every specification of the charge against John Mitchell was barred at the institution of the proceeding, and the judgment convicting him of contempt should therefore be reversed. The fifth specification of the charge against Frank Morrison is the only one not barred by limitation, and that one lacks the distinctness of allegation required in such a case. For example, it charges him with wilfully aiding Samuel Gompers in the circulation of the American Federationist for January, February, March, April, May, June, and September, 1908, in each of which reference was made to the Buck Stove & Range Company, in connection with the unfair list, etc. As to the numbers of January, February, March, April, May, and June, the charge is barred. Only the last number, for September, 1908, comes within the three-year period. As to this the charge is too general to put the party upon notice.

In my search of the record I find but two paragraphs read from the Federationist of September, 1908. The first paragraph is a recital of the fact that Gompers, Morrison, and Mitchell had been "hailed into court, charged with violating the celebrated injunction order. * * * Money makes the mare go, and Mr. Van Cleave's money is making this contempt case

go, but we have had Van Cleaves before, and will have them in the future, and labor will rise in its might and crush Mr. Van Cleave and all his money that may work now or in the future for the purpose of restricting labor in its fundamental rights of free speech and free press." It is a fact that the proceeding for contempt there referred to was instituted by Mr. Van Cleave, as president of the prosecuting company, and apparently at his expense.

The second paragraph is on the subject of free speech and free press, as threatened by injunctions, but contains no mention of the boycott or the names of any of the parties. Both paragraphs were objected to as irrelevant. In one place also in the record of the testimony it would appear that the entire petition filed against the defendants, for contempt, by the Buck Stove & Range Company was published in the same number. I perceive no violation of the injunction in any of these articles. All newspapers had the right to publish the court proceedings.

Coming to the specifications of the charges against Samuel Gompers that are within the three-year period. The charge in Article 10, July, 1908, is the publication of the facts in regard to the granting of the injunction. This gives a general statement of the points of the injunction, and concludes with the following paragraph: "The injunction does not compel anyone to buy the Van Cleave stoves and ranges." It certainly was not a violation of the injunction to publish the fact that it had been granted; and as regards the paragraph above, this is a statement of a fact, and does not necessarily show an intention to violate the injunction order. Article 11, September, 1908. This seems to me to be an expression of opinion with regard to the effect of the action of the court which was not prohibited by the injunction. Article 12 is to the same effect. Article 13 containing extracts from the speech of Samuel Gompers of September 29, 1908, is to the same effect. Article 14 likewise. Article 15, which contains the report of a speech made at a reception November, 1908, is of the same character. Article 16 contains the report of a speech made by

Gompers at Baltimore. In this there is no violation of the in-junction. It is true that he described the injunction as an un-warranted invasion of his rights, and said that it is the duty of the citizen in such case to refuse obedience and to take whatever consequences may ensue. While this may have shown an intention to continue the boycott in violation of the injunc-tion, if there was any evidence that the boycott had been con-tinued, yet, in the absence of any proof that the boycott had been continued, or there ever had been an express violation of the injunction, the remark itself was not a violation. It is a heated expression, and nothing more than the braggadocio of a political speech.

It is to be remembered that the publication of the "Unfair list" had been discontinued in obedience to the command of the injunction, and there is no evidence that the prohibited boy-cott had been renewed or carried on by anybody, anywhere. It is declared by the supreme court that the proof of the offense must be established beyond a reasonable doubt. Each defendant had made answer under oath denying any violation of the injunction, or any attempt, or intent to disobey the order of the court. It is true that the rule of the common law which permitted one to acquit himself of contempt by denial of the charge under oath no longer prevails in this jurisdiction. *Pierce* v. *United States,* 37 App. D. C. 582–586; *United States* v. *Shipp,* 203 U. S. 563–574, 51 L. ed. 319–324, 27 Sup. Ct. Rep. 165, 8 Ann. Cas. 265. But as suggested in the *Shipp Case,* the rule might apply where the intent is ambiguous.

As weight has been given to the failure of the defendants to take advantage of the suggestion made in the report of the committee, which is copied in the opinion of the court, I take leave to express my views upon the point. This suggestion as-sumes the guilt of each defendant, and is that they confess that guilt, make due apology, and assurance of their submission in future to the law as pronounced in the opinions of the courts. In case of compliance with this suggestion it is suggested to the trial court that it accept the same and extend mercy. The failure of the several defendants to act upon this suggestion

should, in my opinion, have ended the matter then and there. The trial court, however, pressed the matter, especially upon defendant Mitchell, as is shown in several pages of the printed record. The defendant answered that he had truthfully asserted that he had not disregarded the injunction, or aided in the prosecution of a boycott, and was disinclined to make any statement that would be regarded as either directly or inferentially an acknowledgment that his testimony is not true. Responding to a final suggestion of the trial justice, he addressed him the following letter, which is embodied in the record.

Mount Vernon, N. Y.
February 17, 1912.

Hon. Daniel Thew Wright, Associate Justice,
Supreme Court of the District of Columbia,
Washington, D. C.

Sir:—

At the close of my cross-examination in the contempt proceedings instituted against Mr. Gompers, Mr. Morrison, and me, the court stated that I was free, at any time, before these proceedings close, to give expression to the court, either orally or in written communication, upon the subject of the following recommendation:

"The court strongly recommends that you consider again the propriety of acquainting the court, before these proceedings close, with your conviction whether you ought and whether you expect hereafter to lend adherence to the degrees of the judicial tribunals of the land in matters committed by law to their jurisdiction and power."

I have given the court's recommendation careful thought and serious consideration, as a result of which I desire to say that I believe a statement by me that I "expect hereafter to lend adherence to the decrees of the judicial tribunals of the land" would be subject to no other interpretation than that I had heretofore failed or refused to comply with the lawful decrees of the courts, and that my evidence in this proceeding

was not truthful and sincere and in keeping with the facts in this case. I am not willing to make any statement that would impugn my own testimony. I am not willing by any device or subterfuge to attempt to deceive the court or secure an acquittal by any other means than those of the evidence and the truthfulness of the testimony.

Indeed, I should feel more contentment if convicted conscious of the rectitude of my course and the truthfulness of my evidence, than if acquitted on any other grounds than the facts as they have been presented to the court, and the law as it has been enunciated by the higher tribunals.

Yours respectfully,<br>
(Signed) John Mitchell.

The failure or refusal to accept the suggestion has been considered as "important in measuring the intent and temper of the defendants." I am unable to see how the refusal to apologize for an act, the commission of which had been expressly denied, shows a reprehensible intent or temper. On the contrary, it seems to me the natural conduct of a self-respecting man. Having sworn that he had neither disobeyed nor intended to disobey the mandate of the court, a confession that he had done so would be a solemn admission of the commission of wilful perjury. Moreover, the demand that the court be acquainted "before these proceedings close, with your conviction whether you ought and whether you hereafter expect to lend adherence to the decrees of judicial tribunals of the land in matters committed by law to their jurisdiction and power," was entirely outside of the offense charged, and beyond the power of any court.

In my opinion the judgment should be reversed.

A petition by the appellants for the allowance of a writ of error to remove the cause to the Supreme Court of the United States for review by that court was denied by the court of appeals May 23, 1913.

Thereupon the appellants applied to the chief justice of the

Supreme Court of the United States for the allowance of an appeal, or writ of certiorari, and thereafter the supreme court of the District of Columbia, by its several justices and through the committee of the bar, theretofore appointed by that court to act in the contempt proceedings, filed in the Supreme Court a petition for the allowance of a writ of certiorari, in which petition, after calling attention to the modification by the court of appeals of the punishment of the appellants, the petitioner said: "The jurisdiction thus assumed by the court of appeals is not only in departure from its own repeated adjudications upon the question involved (*Gompers* v. *Buck Stove & Range Co.* 33 App. D. C. 516, 577; *Pierce* v. *United States,* 37 App. D. C. 582, 587; *Raymond* v. *United States,* 26 App. D. C. 250, 257), but is one of great general interest and of far-reaching importance and effect; since, if correct, it not only makes sentence imposed by this court in every case of either a criminal or of a quasi criminal nature appealable to the court of appeals, but takes from this court, and from all other courts of similar character, the summary power to enforce their orders and decrees and to vindicate assaults upon them which have hitherto been held inherent in and necessary to the existence of all courts, and postpones, if sustained, the prompt and necessary assertion by this and similar courts of their inherent powers, and the enforcement of their orders, judgments, and decrees, until after an appellate tribunal shall have passed upon, concurred in, revised, or modified the orders and judgments in cases of contempt which the courts whose authority has been offended against have imposed.

"In view of the great public importance of the questions involved, this court concurs in the petition of the said respondents, which they are advised is to be by them presented to the Supreme Court of the United States, that a writ of certiorari may be issued requiring the court of appeals of the District of Columbia to certify to the Supreme Court of the United States, for consideration and review by it of the questions presented to and determined by the said court of appeals in the contempt proceedings against the said Samuel Gompers, John Mitchell,

and Frank Morrison, the proceedings in said cause No. 2477 in the court of appeals of the District of Columbia, to the end that said questions may be determined in accordance with law and as their great importance demands."

On June 20, 1913, there was received by the court of appeals an order signed by the chief justice of the Supreme Court of the United States, allowing an appeal and writ of error to that court, and the record was accordingly removed thereto.